**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 20-50345 |
| *Plaintiff-Appellee,* | D.C. No. |
| v. | 5:20-cr-00071-RGK-1 |
| JONATHAN EDWARD CHARLES ANDERSON, AKA Johnathan Anderson, AKA Johnathan Edward Anderson, AKA Jonathan Charles Anderson, AKA Jonathan Edward Anderson, AKA Jonathan Edward Cha Anderson, AKA Jonathon Edward Anderson, AKA X Rage, | OPINION |
| *Defendant-Appellant.* | |

Appeal from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued and Submitted March 10, 2022
Pasadena, California

Filed December 29, 2022

Before:  Sandra S. Ikuta, Kenneth K. Lee, and Danielle J.
Forrest, Circuit Judges.

Per Curiam Opinion;
Partial Dissent by Judge Lee;
Partial Dissent by Judge Forrest

## SUMMARY[*]

### Criminal Law

The panel affirmed the district court's order denying Jonathan Anderson's motion to suppress a handgun found during an inventory search of his truck, vacated a condition of supervised release, and remanded, in a case in which Anderson entered a conditional guilty plea to being a felon in possession of a firearm.

Anderson was stopped for a license-plate violation, and deputies from the San Bernardino County Sheriff's Department (SBCSD) discovered that he had an expired driver's license and a long criminal history. The deputies conducted an inventory search before towing Anderson's truck, and, after finding a handgun under the driver's seat of his truck, arrested Anderson for being a felon in possession of a firearm.

The panel held that the district court did not err in concluding that the government established that a valid community caretaking purpose existed for impounding and inventorying Anderson's truck before the search was conducted. The panel wrote that the deputies had an

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

objectively reasonable belief that Anderson's truck, which he had parked in a private driveway, was parked illegally. The panel noted that the district court found that the homeowner wanted the car off the property and that there was no one available to move Anderson's truck because Anderson did not have a valid license, he had no passengers with him, and he told the deputies he was not from the area where he was stopped. The panel wrote that the district court did not clearly err in finding that the deputies spoke to the homeowner before conducting the search. Because this finding is entitled to deference, the panel wrote that no remand is required.

The panel disagreed with Anderson's assertion that the deputies' inventory search was invalid because they failed to comply with the SBCSD's standardized inventory search procedures. The panel wrote that the inventory search was conducted pursuant to a standard policy, and was performed in good faith, not solely for the purpose of obtaining evidence of a crime; therefore, the government's interest in protection of property and protection of the police outweighed Anderson's expectation of privacy in the contents of his car, and the search was reasonable for Fourth Amendment purposes.

Applying *United States v. Magdirila*, 962 F.3d 1152 (9th Cir. 2020), the panel vacated a risk-notification condition of Anderson's supervised release, and remanded for the district court to craft a condition that accords with Anderson's criminal history.

Dissenting in part, Judge Lee agreed that the inventory search was lawful, but would remand to the district court the issue of whether the officers spoke with the homeowner to verify that Anderson's car was unlawfully parked outside his

house *before* searching Anderson's car, given conflicting testimony and the district court's inaccurate characterization of the record.

Dissenting in part, Judge Forrest agreed that a valid community-caretaking purpose existed to impound the truck and conduct an inventory search, but disagreed that the deputies conducted a valid inventory search. She wrote that the Fourth Amendment is violated where, as here, officers are required to prepare a full inventory of the property found during a search of an impounded vehicle and they inventory only that property found that has evidentiary value such that the administrative purposes animating the inventory-search exception are subverted, and there otherwise is no indication that administrative purposes motivated the "inventory" search.

## COUNSEL

Gia Kim (argued), Trial Attorney; Ashwini S. Mate, Deputy Federal Public Defender; Cuauhtemoc Ortega, Federal Public Defender, Office of the Public Defender, Los Angeles, California; for Defendant-Appellant.

Byron R. Tuyay (argued), Assistant United States Attorney, Office of the United States Attorney, Riverside, California; Bram M. Alden, Assistant United States Attorney, Criminal Appeals Section Chief, Office of the United States Attorney, Los Angeles, California; Tracy L. Wilkison, Acting United States Attorney; for Plaintiff-Appellee.

# OPINION

PER CURIAM:

Defendant Jonathan Anderson was stopped for a license-plate violation, and deputies from the San Bernardino County Sheriff's Department (SBCSD) discovered that he had an expired driver's license and a long criminal history. The deputies conducted an inventory search before towing Anderson's truck, and, after finding a handgun under the driver's seat of his truck, they arrested Anderson for being a felon in possession of a firearm.  Anderson moved to suppress the handgun, arguing that the deputies violated the Fourth Amendment because the inventory search was invalid.  The district court denied his motion, and Anderson entered a conditional guilty plea retaining his right to appeal the suppression decision.  The district court sentenced Anderson to a prison term followed by three years' supervised release.  Anderson appeals the denial of his suppression motion and one of the conditions of his supervised release.  We have jurisdiction under 28 U.S.C. § 1291, and we affirm the district court's suppression order and vacate as unconstitutionally vague Standard Condition 14 of Anderson's term of supervised release.

I

A

At approximately 2:00 a.m., SBCSD Deputy Daniel Peterson noticed the license plate on Anderson's truck was partially obscured in violation of California Vehicle Code § 5201, so he initiated a traffic stop.  According to Deputy Peterson, after he activated his lights, Anderson abruptly turned onto a dead-end street and accelerated to the end of

the road.  Deputy Peterson called for backup and alerted dispatch that Anderson was "slow to stop" and "pulling into an apartment complex."  About 30 to 45 seconds after Deputy Peterson initiated the stop, Anderson pulled into the driveway of a home and got out of his truck.

Deputy Peterson believed that Anderson was attempting to flee and confronted him at gunpoint.  He instructed Anderson to turn around, put his hands up, and kneel down. Anderson, who disputes that he was trying to flee, complied with the request and repeatedly asked why he had been pulled over.  Shortly thereafter, Deputy Kyle Schuler arrived and handcuffed Anderson.  Anderson told the deputies that he was parked in the driveway of "a friend" and that his license was expired.  He also stated that he did not see Deputy Peterson's overhead lights and that he was not from the area.  Deputy Peterson radioed dispatch.  2:05 a.m., dispatch informed the deputies that Anderson had an expired license and was a career criminal.

The parties dispute what happened next.  According to Anderson, Deputy Peterson began searching his truck within seconds of learning that he was a career criminal.  The deputies claim that the search did not happen immediately and Deputy Peterson only picked up Anderson's keys from where he had thrown them in the lawn.  At this point in the incident, Anderson is heard on Deputy Peterson's belt recording saying: "You can't check my truck . . . why can you search my truck?"  The deputies told Anderson that they were going to tow his truck because he did not have a valid license and that they needed to conduct an inventory search. The deputies refused Anderson's request to have a friend come get his truck.

After detaining Anderson in the back of a patrol car, the deputies testified that before they started the search, Deputy Schuler spoke to the owner of the home where Anderson parked to confirm whether he knew Anderson.  Anderson claims that the deputies did not talk to the homeowner until after they completed the inventory search.  There is no dispute that the homeowner did not know Anderson and wanted Anderson's truck removed from his driveway.  During the inventory search, Deputy Peterson found a loaded handgun under the driver's seat and arrested Anderson for being a felon in possession of a firearm.  The entire incident, from when Deputy Peterson noticed Anderson's obscured license plate to when he called in the gun to dispatch, lasted approximately seven minutes.  Deputy Schuler stayed at the scene after Anderson was taken to jail to complete the requirements of the SBCSD Manual, which provides a standard administrative procedure for an inventory search.  According to the SBCSD Manual, when a deputy stores or impounds a vehicle, the deputy "shall [c]omplete two (2) CHP 180 Forms," which include "an inventory of any personal property contained within the vehicle," and "the signature, date, and time of the arrival of the tow truck driver."  The deputy must also "[e]nsure that the report is immediately completed and processed."

In complying with these requirements, Deputy Schuler completed most of the information required by the CHP 180 form, including checking off boxes to show the presence of two radios and a firearm in the car, although he did not document other property in the car, such as two pairs of sunglasses, a watch, a box of tools, and a bottle of cologne.  Deputy Schuler also filled out the portion of the CHP 180 form for indicating existing scratches, dents, and damage to the truck.  As required by the SBCSD Manual, Deputy

Schuler included the tow truck driver's signature and time of arrival on the CHP 180 form.  The deputies submitted the form for processing the same day.  In addition to filling out the form, the deputies took photographs of property found inside the car, including a speaker, iPhone cord, and tools, and also completed a police report documenting that a compact disc, gun, holster, and ammunition were found in the car.

## B

The government charged Anderson with a single count of felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1).  Anderson moved to suppress evidence of the firearm on the grounds that the inventory search was unconstitutional.  First, he claimed that the deputies lacked a valid "community caretaking purpose" when they conducted the search.  Second, he argued that the deputies violated California law when impounding his truck.  Third, he argued that, even if there was a valid community caretaking purpose, the search was invalid because the deputies did not follow SBCSD procedures in conducting the search and they had an impermissible investigatory motive.

After the suppression hearing, during which the deputies and the homeowner testified, the district court held that the search was proper and denied Anderson's motion.  The district court found that Anderson did not have a valid driver's license and that the homeowner did not know Anderson or want the truck on his property.  Regarding whether there was a valid community caretaking purpose for impounding the truck, the key question for the district court was "whether or not [the deputies] searched the car before or after they talked to the homeowner" and learned that he did not know Anderson.  The court noted that "there [were] a lot

of discrepancies and inconsistencies in the testimony." But based on "the credibility and looking at what [was] speculative and what [was] the evidence," the court found that the record established that the deputies did "talk to the homeowner before they searched the car."**1** The district court did not address whether the deputies complied with California law or SBCSD policy or whether they had an impermissible motive for the search.

Anderson entered a conditional guilty plea reserving his right to appeal the suppression order, and the district court sentenced him to 77 months' imprisonment and three years' supervised release. The district court imposed numerous standard conditions as part of Anderson's supervised release, including that he "notify specific persons and organizations of specific risks posed by [him] to those persons and organizations."

## II

We review de novo a "district court's rulings on motions to suppress." *United States v. Barnes*, 895 F.3d 1194, 1199 (9th Cir. 2018) (citation omitted). The "district court's underlying factual findings" are reviewed for clear error. *United States v. Lara*, 815 F.3d 605, 608 (9th Cir. 2016). A factual finding is clearly erroneous when it is "illogical,

---

**1** The court also noted that even if the deputies did not talk to the homeowner first, the doctrine of inevitable discovery "may play a part in this." The government does not rely on this doctrine on appeal, nor did it below. Therefore, even if that theory were plausible, "[i]t is the government's burden to show inevitable discovery, so its failure to make the argument prevents us from upholding the denial of the suppression motion on that theory." *United States v. Ngumezi*, 980 F.3d 1285, 1291 (9th Cir. 2020).

implausible, or without support in the record." *United States v. Spangle*, 626 F.3d 488, 497 (9th Cir. 2010). Where "testimony is taken, the district court's credibility determinations are given special deference." *United States v. Arreguin*, 735 F.3d 1168, 1174 (9th Cir. 2013) (internal quotation marks and citation omitted).

## A

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. The Fourth Amendment's "essential purpose" is "to impose a standard of 'reasonableness' upon the exercise of discretion by government officials, including law enforcement agents, in order 'to safeguard the privacy and security of individuals against arbitrary invasions.'" *Delaware v. Prouse*, 440 U.S. 648, 653–54 (1979) (citations omitted). The Fourth Amendment's reasonableness standard "is not capable of precise definition or mechanical application," *Bell v. Wolfish*, 441 U.S. 520, 559 (1979), and "each case must be decided on its own facts." *South Dakota v. Opperman*, 428 U.S. 364, 373 (1976) (citation omitted).

As a general rule, the government must obtain a warrant based on probable cause in order to conduct a search, but there are exceptions to this requirement. *See Mitchell v. Wisconsin*, 139 S. Ct. 2525, 2534 (2019). The Supreme Court evaluates the reasonableness of a warrantless search "by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests." *Prouse*, 440 U.S. at 654.

One "well-defined exception to the warrant requirement" is the inventory search. *Illinois v. Lafayette*,

462 U.S. 640, 643 (1983); *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). This exception arises under the community caretaking exception to the warrant requirement for seizure of property. *See United States v. Cervantes*, 703 F.3d 1135, 1140–41 (9th Cir. 2012). "Under the community caretaking exception, 'police officers may impound vehicles that jeopardize public safety and the efficient movement of vehicular traffic.'" *Id.* at 1141 (quoting *Miranda v. City of Cornelius*, 429 F.3d 858, 864 (9th Cir.2005) (internal quotation marks omitted)). "[T]he reasonableness of the impoundment depend[s] on whether the impoundment fits within the authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience." *Id.* (internal quotation marks omitted). "[I]mpoundment serves some 'community caretaking'" purpose if a vehicle is "parked illegally, pose[s] a safety hazard, or [i]s vulnerable to vandalism or theft." *Id.* (internal citation omitted). For example, a community caretaking purpose exists where a vehicle is blocking parking lot spaces "in a manner that could impede emergency services" to a building and neither the driver nor any passenger is legally able to move it. *See United States v. Torres*, 828 F.3d 1113, 1120 (9th Cir. 2016). Impoundment is also justified where a vehicle is parked in "the middle of the street," *United States v. Johnson*, 889 F.3d 1120, 1126 (9th Cir. 2018), left in a public parking lot without anyone to retrieve it, *see Ramirez v. City of Buena Park*, 560 F.3d 1012, 1025 (9th Cir. 2009); *Hallstrom v. City of Garden City*, 991 F.2d 1473, 1477 n.4 (9th Cir. 1993), or totaled and lying in a ditch, *see United States v. Garay*, 938 F.3d 1108, 1111 (9th Cir. 2019).

Conversely, "[a]n officer cannot reasonably order an impoundment in situations where the location of the vehicle does not create any need for the police to protect the vehicle

or to avoid a hazard to other drivers." *Miranda*, 429 F.3d at 866 (citation omitted).  One such location is where a vehicle is parked in its owner's driveway, even though the owner drove without a valid driver's license.  *See id.* at 865–66. Nor is there a valid community caretaking purpose justifying impoundment where a vehicle is legally parked in a residential neighborhood and there is no evidence that it would be susceptible to theft or vandalism.  *See Cervantes*, 703 F.3d at 1141–42; *United States v. Caseres*, 533 F.3d 1064, 1075 (9th Cir. 2008).

## B

"Once a vehicle has been legally impounded, the police may conduct an inventory search, as long as it conforms to the standard procedures of the local police department." *Cervantes*, 703 F.3d at 1141 (citations omitted).  An inventory search of a vehicle is reasonable under the Fourth Amendment because the government's legitimate interests in conducting such a search "outweigh[] the individual's privacy interests in the contents of his car." *Lafayette*, 462 U.S. at 647.  According to the Court, "the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." *Opperman*, 428 U.S. at 367.  Weighed against this lowered expectation of privacy, the government has a legitimate interest in "the protection of the owner's property while it remains in police custody; the protection of the police against claims or disputes over lost or stolen property; and the protection of the police from potential danger." *Id.* at 369 (citations omitted).

Because inventory searches are non-criminal in nature, they need not be justified by probable cause, which "is peculiarly related to criminal investigations, not routine,

noncriminal procedures." *Id.* at 370 n.5 (citation omitted). "The probable-cause approach is unhelpful when analysis centers upon the reasonableness of routine administrative caretaking functions, particularly when no claim is made that the protective procedures are a subterfuge for criminal investigations." *Id.*

The Court may impose safeguards on a warrantless search "to assure that the individual's reasonable expectation of privacy is not 'subject to the discretion of the official in the field.'" *Prouse*, 440 U.S. at 655 (citing *Camara v. Mun. Ct. of City & Cnty. of San Francisco*, 387 U.S. 523, 532 (1967)). In the context of an inventory search, the individual's privacy interest is protected by routine administrative procedures that limit an officer's discretion in conducting the search. *See id.*; *see also Lafayette*, 462 U.S. at 648 (holding that a warrantless search of an arrestee's person and effects incident to booking the arrestee is reasonable when it is "part of the routine procedure incident to incarcerating an arrested person"). Even if the officers have some discretion in conducting an inventory search, the search remains reasonable "so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity." *Bertine,* 479 U.S. at 375. While inventory procedures "do not define constitutional rights," they do "assist courts to determine whether an inventory search is legitimate, as opposed to pretextual," because a search that materially deviates from established procedure may raise the inference that it was merely "an excuse to rummage for evidence." *Garay*, 938 F.3d at 1111.

For purposes of the Fourth Amendment's reasonableness test, the issue is whether the inventory search is pretextual, not whether it fails to achieve full compliance with the

administrative procedures. "[R]easonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment," even if the police implementation of standardized inventorying procedure is "somewhat slipshod." *Bertine,* 479 U.S. at 369, 374. For instance, *Bertine* upheld the validity of an inventory search even though the officer "failed to list $150 in cash found in respondent's wallet or the contents of a sealed envelope marked 'rent,' $210, in the relevant section of the property form," made "no reference to other items of value, including respondent's credit cards, and a converter, a hydraulic jack, and a set of tire chains, worth a total of $125," failed to list the "$700 in cash found in respondent's backpack, along with the contraband," among other failings. *Id.* at 383 (Marshall, J., dissenting). We have adopted the principle that "administrative errors should not, on their own, invalidate inventory searches: 'There must be something else; something to suggest the police raised "the inventory-search banner in an after-the-fact attempt to justify" a simple investigatory search for incriminating evidence.'" *Garay*, 938 F.3d at 1112 (citations omitted). The failure to complete an inventory form or "other comparable administrative errors" does not invalidate the search if there is no evidence that the "the officers were rummaging for evidence." *Id.* at 1111–12.

Moreover, an "otherwise reasonable inventory search" is not invalid merely because the police have a mixed motive for the search. *See id.* at 1112–13. When an inventory search would have occurred in the absence of a motive to search for evidence of a crime, "the mere presence of a criminal investigatory motive or dual motive—one valid, and one impermissible—does not render an [inventory] search invalid." *United States v. Magdirila*, 962 F.3d 1152,

1157 (9th Cir. 2020) (cleaned up).  So long as the police did not act "in bad faith or for the *sole* purpose of investigation," an inventory search is valid.  *Bertine*, 479 U.S. at 372 (emphasis added).

In sum, once the government has established that the vehicle in question was impounded for a valid community caretaking purpose, *see Cervantes*, 703 F.3d at 1141; *Johnson*, 889 F.3d at 1125, an inventory search does not violate an individual's Fourth Amendment rights if: (1) it is conducted pursuant to a standard policy (even if compliance with the policy is less than perfect); and (2) it is performed in good faith (meaning it is not conducted solely for the purpose of obtaining evidence of a crime).  *See Cervantes*, 703 F.3d at 1141; *Bertine*, 479 U.S. at 372.  When the inventory search meets these criteria, the government's legitimate interests outweigh the intrusion on the individual's privacy interests.

## III

We address two questions: whether the government impounded the vehicle in this case pursuant to a valid community caretaking purpose, and whether the inventory search was valid.  We conclude that the government satisfied its burden and the district court did not err in denying Anderson's motion to suppress.

### A

We begin with the impoundment issue.  Although California law authorizes impoundment of a vehicle where the driver does not have a valid driver's license, Cal. Veh. Code § 14607.6, this alone does not establish a valid community caretaking purpose that satisfies the Fourth Amendment.  *See Miranda*, 429 F.3d at 864–66.  The

deputies must have had an objectively reasonable belief that Anderson's truck was "parked illegally, posed a safety hazard, or was vulnerable to vandalism or theft." *Cervantes*, 703 F.3d at 1141. We conclude that they did.  As the district court found, Anderson parked his truck in a private driveway, and the homeowner "wanted the car off the property" because the homeowner did not know Anderson. Additionally, there was no one available to move Anderson's truck because Anderson did not have a valid driver's license, he had no passengers with him, and he told the deputies that he was not from the area where he was stopped.

Anderson does not dispute that his truck could not stay where he parked it. Rather, he argues that the district court clearly erred in finding that the deputies knew that *before* they searched his vehicle because Officer Peterson's belt recording, combined with timestamps from the dispatch log, demonstrate that it was impossible for the deputies to have talked to the homeowner before searching the truck.  He contends that because Deputy Schuler can be heard on the recording up until Deputy Peterson started searching, he could not have talked to the homeowner before the search. Alternatively, he contends that even adopting the government's timeline of events, the recording and the dispatch log show that the deputies would have had, at most, two minutes and 10 seconds to speak with the homeowner, locate the firearm, and call it in to dispatch.[2]  Anderson

---

[2] While Anderson's brief claims deputies had "one minute and 50 seconds," this appears to be based on a mathematical error as the brief bases this time calculation on the gap between Deputy Schuler being last heard on the recording, 2:06:36 a.m., and Deputy Peterson calling in the serial number of the firearm into dispatch, 2:08:46 a.m.

argues that this timeline is both impossible and inconsistent with the homeowner's testimony at the suppression hearing that it took him a minute or two to wake up and answer the door and that he spoke with Deputy Schuler for "several minutes." We disagree that the district court clearly erred in finding that the deputies spoke to the homeowner before conducting the search.

Although the district court could have provided more reasoning, it is evident from its findings that it credited the testimony of the deputies over the homeowner's testimony based on "judging the credibility" of the witnesses. We must give special deference to the district court's credibility determinations, and we cannot conclude that it was illogical or implausible for the district court to reject the homeowner's time estimates and give more credit to the deputies' accounts. *Arreguin*, 735 F.3d at 1174. Nor was it illogical or implausible for the district court to conclude that the deputies talked to the homeowner and located the firearm in the span of two minutes and ten seconds. The conversation with the homeowner occurred on his front porch near Anderson's truck, and the firearm was found under the driver's seat, not some obscure or hard-to-reach location.

In light of our special deference to the district court's credibility determinations, we reject Judge Lee's argument that the case should be remanded "to resolve the potentially inconsistent evidence and to provide a more detailed explanation." KKL Dissent at 23. Although the district court noted "a lot of discrepancies and inconsistencies in the testimony," it made a finding that the "only evidence before [it] at [the] time, other than speculation, from the testimony of the witnesses, is that [the deputies] did talk to the

homeowner before they searched the car."  Because this finding is entitled to deference, no remand is required.

Anderson also disputes that a valid community caretaking purpose existed because he told the deputies that he had a friend who was available to move the truck more quickly than a tow truck could, but the deputies refused to allow him to contact his friend.  This argument likewise fails. Even if Anderson did have a friend who could have retrieved his truck, an officer "is not required to consider the existence of alternative less intrusive means when [a] vehicle must in fact be moved to avoid the creation of a hazard or the continued unlawful operation of the vehicle." *Miranda*, 429 F.3d at 865 n.6 (citation and internal quotation marks omitted).  Again, the Fourth Amendment's ultimate concern is reasonableness. *See id.* at 864–65. The friend was not present, and Anderson lied to the deputies at the outset by claiming that a "friend" lived in the house where he parked. The deputies had also learned by this point that Anderson had a significant criminal history.    Under these circumstances, it was not unreasonable for the deputies to impound Anderson's truck rather than allow him to supposedly call an unknown person at 2:00 a.m. to retrieve it for him.  *See Torres*, 828 F.3d at 1119 n.2.

Finally, Anderson asserts that the deputies acted unreasonably because California law permits impoundment only "[i]f a vehicle is illegally parked so as to block the entrance to a private driveway *and it is impractical to move the vehicle* from in front of the driveway to another point on the highway." Cal. Veh. Code § 22651(d) (emphasis added). But California law also provides that if "a driver is unable to produce a valid driver's license on the demand of a peace officer," a vehicle "shall be impounded regardless of ownership."   Cal. Veh. Code § 14607.6(c)(1).   Because

Anderson had an expired license, the deputies were not required by state law to determine whether it was impractical to move his truck before impounding it.

In sum, we conclude that the district court did not err in concluding that the government established that a valid community caretaking purpose existed for impounding and inventorying Anderson's truck before the search was conducted.

### B

Having established a valid community caretaking function, we turn to the inventory search issue. Anderson asserts that the deputies' inventory search was invalid because they failed to comply with the SBCSD's standardized inventory search procedures. Again, we disagree, because the inventory search of Anderson's car was conducted pursuant to a standard policy, and was performed in good faith, not solely for the purpose of obtaining evidence of a crime. *See Cervantes*, 703 F.3d at 1141. Therefore, the government's interest in protection of property and protection of the police, *Opperman*, 428 U.S. at 367, outweighed Anderson's expectation of privacy in "the contents of his car," *Lafayette*, 462 U.S. at 647, and the search was reasonable for Fourth Amendment purposes.

We first consider the deputies' compliance with the standardized policy, the SBCSD Manual, which serves as "guidelines which have been established to assist the officer in making his decision." The deputies completed each of the four steps of their responsibilities when impounding vehicles as set out in the SBCSD Manual. As required by these guidelines, Deputy Schuler filled out two CHP 180 Forms, including checking off boxes to show the presence of two radios and a firearm and indicating existing damage to the

truck.    Additionally,  Deputy  Schuler  documented  "the
arrival  of  the  tow  truck  driver"  on  the  CHP  180  form,  and
submitted  the  CHP  180  forms  for  processing  the  same  day.
Although  the  CHP  180  forms  did  not  list  every  piece  of
property  in  the  car,  the  deputies  also  took  photographs  of
property  found  inside  the  car  and  completed  a  police  report
documenting  other  items  found  in  the  car.   *See supra* at 7–
8.**3**

Second,  the  deputies'  substantial  compliance  with  the
procedures  in  the  SBCSD  Manual  supports  the  conclusion
that  the  deputies  performed  the  search  in  good  faith,  meaning
it  was  not  conducted  solely  for  the  purpose  of  obtaining
evidence  of  a  crime.    *See Cervantes*, 703 F.3d at 1141.
Although  the  deputies  did  not  fill  out  the  form  completely  or
perfectly,  we  note  that  any  gaps  in  the  deputies'  inventory
are  much  less  significant  than  the  gaps  in  the  inventory
prepared  by  the  officers  in  *Bertine*,  479  U.S.  at  383
(Marshall,  J.,  dissenting)  (failing  to  list  over  $1000  in  cash,
contraband,  and  multiple  other  items  of  value),  or  the
inventory  prepared  in  *Garay*,  938  F.3d  at  1110  (listing  only
firearms),  both  of  which  were  held  to  be  valid  inventory
searches.    In  light  of  *Bertine*,  the  deputies'  mere  deficiency
in  complying  with  the  SBCSD  Manual  is  insufficient  to
establish  that  the  search  was  pretextual  and  that  the  deputies'
*sole*  motive  was  to  search  for  evidence  of  a  crime.    479  U.S.
at  372.   As  we  have  previously  explained,  the  defendant  must

---

**3** Judge Forrest errs in ignoring the deputies' good faith compliance with
the  four  steps  of  the  SBCSD  administrative  procedures  and  instead
basing  her  arguments  on  the  incompleteness  of  the  property  list,  DJF
Dissent  at  27,  30–31,  given  that  neither  the  Supreme  Court  nor  we  have
placed  much  weight  on  such  deficiencies.   *See Bertine*, 479 U.S. at 375;
*Garay*, 938 F.3d at 1112.

show "something else; something to suggest the police raised 'the inventory-search banner in an after-the-fact attempt to justify' a simple investigatory search for incriminating evidence," *Garay*, 938 F.3d at 1112 (citations omitted).  Neither Anderson nor Judge Forrest offers any additional evidence (beyond the deficiency in preparing a full inventory) that the deputies' inventory search was merely "an excuse to rummage for evidence." *Id.* at 1111.[4]

Judge Forrest errs in focusing on "how much deviation from a department's inventory-search policy" the Fourth Amendment allows, DJF Dissent at 25, because an administrative policy does not define Anderson's constitutional rights.  Contrary to Judge Forrest's dissent, the "rule of law" applicable to an inventory search is not an administrative policy or a procedural manual, but rather the Fourth Amendment itself, which protects citizens from unreasonable searches and seizures.  Under the Fourth Amendment's reasonableness standard, the question is not how the deputies' performance compares with the officers in other cases, *compare* DJF Dissent at 29, *with Garay*, 938 F.3d at 1111–12, and *Magdirila*, 962 F.3d at 1158, but the extent to which the deputies' noncompliance raises the inference that their sole motive was to obtain evidence of a crime.  Where, as here, an inventory search is conducted pursuant to a standard procedure, and there is no evidence that the inventory search was conducted solely for the

---

[4] Instead of identifying additional evidence, Judge Forrest can point only to the officers' incomplete inventory itself as suggesting "that something else drove the search," DJF Dissent at 31.  But this is not enough under our caselaw.

purpose of finding evidence of a crime, the search does not violate the Fourth Amendment.

IV

Finally, Anderson challenges a standard condition imposed as part of his term of supervised release that requires him to "notify specific persons and organizations of specific risks" that he poses "to those persons and organizations." Because Anderson did not raise this challenge in the district court, we review for plain error. *United States v. Cope*, 527 F.3d 944, 957 (9th Cir. 2008).

In *Magdirila*, we held that a supervised release condition with identical language to the one imposed on Anderson was unconstitutionally vague. 962 F.3d at 1158–59. The government concedes that Anderson's challenged standard condition should be vacated and remanded consistent with our prior holding. Therefore, as in *Magdirila*, we vacate Standard Condition 14 imposed as part of Anderson's term of supervised release and remand for the district court to "craft a supervised release condition that accords with [Anderson]'s criminal history." *Id.* at 1159.

**AFFIRMED in part; VACATED in part; REMANDED for resentencing.**

---

LEE, Circuit Judge, dissenting in part.

The community-caretaking exception allows law enforcement to search a vehicle that is parked illegally, poses a safety risk, or may invite vandalism or theft. *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2010). But law enforcement cannot invoke this exception to conduct a

warrantless search of a car lawfully parked in a residential driveway.  The dispute here is whether the police officers spoke with the homeowner to verify that Jonathan Anderson's car was unlawfully parked outside his house *before* searching Anderson's car.

The district court held that the "*only* evidence before the Court at this time, other than speculation, from the testimony of the witnesses, is that they did talk to the homeowner before they searched the car."  But in reality, the record appears much murkier and quite contradictory.  I dissent in part because I would have remanded this issue to the district court to resolve the potentially inconsistent evidence and to provide a more detailed explanation.[1]

According to the dispatch log and the audio recording, the officers would have had, at most, about two minutes and 10 seconds to talk to the homeowner, search Anderson's car, find the gun underneath the seat, and then call dispatch.  As the per curiam opinion points, two minutes may have been enough time for law enforcement to do just that.  But the homeowner testified that it took him one or two minutes to answer the door, and that he spoke with the officer for about three to five minutes.    Thus, under the homeowner's timeline, the officers likely could not have talked to him before searching the car.  The homeowner also curiously testified that he spoke with Officer Peterson (who searched the car), not Officer Schuler (who testified that he spoke with the homeowner).

In short, the record reflects competing and contradictory testimony about whether the officers spoke with the

---

[1] I agree with the per curiam opinion that the inventory search was lawful.

homeowner before searching the car. Certainly, there is more than "speculation," as stated by the district court, on this question. The district court may have very well discounted the testimony of the homeowner and Anderson, and instead found the officers more credible. But given this morass of conflicting testimony and the district court's inaccurate characterization of the record, I would have remanded this issue to the district court for further fact-finding and analysis. *Cf. United States v. Crawford*, 372 F.3d 1048, 1054 (9th Cir. 2004) (noting the "twin aims of deterrence and judicial integrity" under our Fourth Amendment jurisprudence).

I thus respectfully dissent.

FORREST, Circuit Judge, dissenting in part.

I agree with the court that a valid community-caretaking purpose existed to impound Anderson's truck and conduct an inventory search. I disagree, however, that the deputies conducted a valid inventory search. As a result, I would reverse the district court's denial of Anderson's motion to suppress and vacate his conviction.

The inventory-search exception is born of administrative, not investigatory, goals. *See Colorado v. Bertine*, 479 U.S. 367, 371–72 (1987). It is permissible for law enforcement to enter and search an impounded vehicle when that "process is aimed at securing or protecting the car and its contents." *South Dakota v. Opperman*, 428 U.S. 364, 373 (1976). A law enforcement officer's compliance with his department's standardized inventory-search procedures assists courts in determining whether the inventory search is

a valid administrative action or a pretext for investigatory action. *See id.* at 375 (noting that whether an officer follows "*standard procedures* in the local police department . . . [is] a factor tending to ensure that the intrusion would be limited in scope to the extent necessary to carry out the caretaking function"); *United States v. Garay*, 938 F.3d 1108, 1111 (9th Cir. 2019) (explaining that department "policies do . . . assist courts to determine whether an inventory search is legitimate, as opposed to pretextual"). This is so because standardized procedures limit an officer's discretion and "ensure[] that impoundments are conducted on the basis of something other than suspicion of evidence of criminal activity." *United States v. Torres*, 828 F.3d 1113, 1118 (9th Cir. 2016) (internal quotation marks and citation omitted); *see also Florida v. Wells*, 495 U.S. 1, 4 (1990) ("The individual police officer must not be allowed so much latitude that inventory searches are turned into a purposeful and general means of discovering evidence of crime." (internal quotation marks and citation omitted)).

The question here is how much deviation from a department's inventory-search policy does the Fourth Amendment's reasonableness inquiry allow? The Supreme Court instructs that inventory searches need not be "totally mechanical." *Wells*, 495 U.S. at 4. More directly, we have held that precision is not required: "minor noncompliance with department policies does not invalidate an otherwise lawful inventory search." *United States v. Magdirila*, 962 F.3d 1152, 1157 (9th Cir. 2020). Rather, an inventory search will be held invalid on this basis only if it "materially deviate[s] from department policy." *Id.* (citing *Garay*, 938 F.3d at 1111).

*Garay* is instructive. There, the defendant led officers on a high-speed chase that ended with him crashing in a ditch.

938 F.3d at 1110. Before towing the defendant's totaled vehicle, the officers performed an inventory search and discovered two loaded firearms, ammunition, and cell phones that they removed and booked into evidence. *Id.* The only property that the officers listed on the inventory report were the firearms. *Id.* at 1110. But the officers also "checked a box on the relevant inventory form indicating that items of potential value were in the car before identifying and booking the items recovered from the car as 'evidence/property.'" *Id.* at 1112. The defendant challenged the inventory search because the officers failed to provide a complete property list, as required by department policy. *Id.* at 1111.

We rejected this challenge, concluding that the officer had complied with department policy "in material respects." *Id.* at 1112. Because "the site was in effect a crime scene, the items in the car were sensibly treated as evidence." *Id.* at 1111–12. And by removing and safeguarding the contents of the car as evidence before towing it from the crash site, the officer fulfilled "the essence of an inventory search." *Id.* at 1111. That is, under the circumstances of that case, where the car was effectively a crime scene, the officer's failure to prepare a complete inventory list "[wa]s not, on its own, a material deviation from policy." *Id.* at 1112.

Similarly, in *Magdirila*, officers impounded and searched a vehicle after the defendant admitted that he did not have a driver's license. 962 F.3d at 1154–55. The relevant department inventory policy required officers to make an "accurate" inventory of the vehicle's content on an inventory form, to list "[a]ll property," and to "be as thorough and accurate as practical in preparing an itemized inventory." *Id.* at 1155 (alteration in original). In the "REMARKS" section of the inventory form, the officer

listed "IPHONE/APPLE WATCH" and cross-referenced a police report. *Id.* On the referenced police report, the officer listed several more items, "including, but not limited to, a black backpack, air pistol, ink cartridges, USB flash drive, and an American Express credit card." *Id.* Although the officers did not provide a complete inventory on the inventory report itself, we held that they "complied substantially" with department policy by incorporating the police report into the inventory report. *Id.* at 1158.

Taken together, these decisions establish that an incomplete inventory report can nevertheless be valid where other documents identify the defendant's property such that the purposes of preparing an inventory are served. But these decisions do not displace the requirement that officers must comply with their departments' administrative policies governing inventory searches, which the Fourth Amendment requires. *See United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012) ("Once a vehicle has been legally impounded, the police may conduct an inventory search, as long as it conforms to the standard procedures of the local police department.").

Here Deputy Schuler did not, as the court suggests, provide "most of the information required by" the San Bernadino County Sheriff's Department (SBCSD) inventory-search policy. Maj. Op. at 7. The only property found in Anderson's truck that Deputy Schuler listed on the inventory report was the firearm used to convict Anderson. That would have been fine if it was the only property found in the truck, but it was not. The court asserts that the deputies substantially complied with SBCSD policy because they photographed the property found inside Anderson's truck and prepared a police report documenting some of the

property.[1] Maj. Op. at 20. But there is no authority supporting the proposition that photographs and a police report can satisfy a department's inventory-report requirement where use of these records is not contemplated by the policy, *and* they are not referenced or attached to the form of report that is required. *See Magdirila*, 962 F.3d at 1158 (officers substantially complied with the department's inventory policy by incorporating the police report into the inventory report). Here, the inventory report did not reference any of Anderson's property other than the one item used as evidence against him, nor does the record show that *any* documents were attached to or filed with the inventory report.

Contrary to the court's suggestion, this was not merely "minor" or "slipshod" noncompliance with SBCSD's policy. *Bertine*, 479 U.S. at 369; *Magdirila*, 962 F.3d at 1157. The policy requires deputies to inventory "*any* personal property contained within the vehicle." Deputies do not have discretion to pick and choose which items to list. The inventory report form itself instructs deputies to list "property, tools . . . ." Under our precedent, the inventory report prepared here cannot be characterized as substantially complying with SBCSD's policy where the deputies described the vehicle being impounded and listed only one of many items found inside the vehicle, which was also the only item used as evidence against Anderson. Among the items omitted from the deputies' inventory were a speaker, a bag of tools, two pairs of valuable sunglasses, a watch, cologne, and other miscellaneous items.

---

[1] Not surprisingly, the property identified in the police report also was limited to items with apparent evidentiary value—a holster, a firearm, and ammunition.

The court notes that the inventory report identified two radios. Maj. Op. at 19. True enough, but this was in the section of the report detailing the features of the truck, including that it had an automatic transmission, a battery, and front and rear seats. There is no indication that the radios were separate items of personal property like the items that were omitted from the inventory report.

Important to the outcome in *Garay* was that the location where the defendant crashed his vehicle was "in effect a crime scene" and the property in the vehicle was booked into evidence. 938 F.3d at 1111–12. Neither is true in this instance. Moreover, the deputies here did not make even a generic notation on their inventory report that "items of potential value" were found in Anderson's truck, as the officers did in *Garay*. *Id.* at 1112. And while the deputies took photos depicting some of Anderson's property, unlike the police report in *Magdirila*, the photos were not referenced in the inventory report nor does the record indicate that they were otherwise made part of the inventory report or filed with the report, as previously noted.[2] 962 F.3d at 1158.

The Government argues that the deputies could have decided not to list all of Anderson's property because they reasonably believed that the items did not have significant value. This is unpersuasive for multiple reasons. First, SBCSD's procedure makes no reference to the value of property in directing deputies to record "*any* personal property contained within the vehicle." *See Bertine*, 479 U.S. at 375 (explaining the Supreme Court precedent does not "prohibit[] the exercise of police discretion so long as that

---

[2] The photos were an incomplete record of Anderson's property; they did not depict the sunglasses and watch, and other items found in the truck.

discretion is exercised according to standard criteria"). Second, the Government's assertion that deputies can selectively determine what is worth inventorying based on an item's assessed value conflicts with the purposes of protecting the defendant's property and protecting deputies from allegations that they "lost, stole[], or vandalized" the defendant's property. *United States v. Johnson*, 889 F.3d 1120, 1125 (9th Cir. 2018) (quoting *Wells*, 495 U.S. at 4). Even if the deputies could reasonably assess the value of property found in impounded vehicles, an item lacking obvious monetary value may nonetheless have value to its owner such that the owner would want it protected and would seek recourse if it were lost or damaged.

Moreover, the record belies the Government's suggestion that the deputies did not create an inventory because they deemed Anderson's property without value. On other occasions, Deputy Schuler did list tools and other items similar to what he found in Anderson's truck on inventory reports. Thus, the assertion that Deputy Schuler simply acted consistently with his routine practice does not account for his failure to inventory Anderson's property.

The bottom line is simple: failing to prepare *any* inventory beyond the one item that was used as evidence against the defendant when there was other property that came within the scope of the department's policy of what should be inventoried contradicts the "essence of an inventory search" and does not serve the administrative purpose of such a search. *Garay*, 938 F.3d at 1111. We have clearly stated that the "purpose of [an inventory] search is to produce an inventory of the items in the car, in order to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *Johnson*, 889

F.3d at 1125 (quoting *Wells*, 495 U.S. at 4). Where officers fail to prepare an inventory that will accomplish these administrative purposes, it suggests that something else drove the search. *See id.* at 1127–28 (noting the officers had "evidentiary motives" where "the items taken from [the defendant's] car were seized and treated specifically as evidence of a crime—not as property held for safekeeping.").

The court contends that the deputies' compliance with some aspects of SBCSD's policy, including documenting the condition and features of Anderson's truck and when the tow truck driver arrived, evidence that the deputies were acting in good faith for administrative purposes. Maj. Op. at 20. I cannot agree. These actions relate to seizing Anderson's truck, not searching the property inside the truck. *See Johnson*, 889 F.3d at 1126–27 (separately analyzing the constitutionality of a vehicle impoundment and the resulting inventory search). As just stated, "[t]he policy or practice governing inventory searches should be designed *to produce an inventory*." *Wells*, 495 U.S. at 4 (emphasis added). SBCSD's policy meets this objective and expressly requires officers to prepare a complete inventory. The deputies' failure to comply with this policy in a meaningful way indicates that they did not search Anderson's truck to ensure that the property located inside was protected or that SBCSD was protected against allegations of property damage or theft. *See Opperman*, 428 U.S. at 369; *Cervantes*, 703 F.3d at 1141. Rather, the circumstances indicate that they were motivated to search the truck for investigatory reasons. Law enforcement officers should not be given the benefit of the inventory-search exception to the warrant requirement in these

circumstances. Any other result undermines the administrative character of inventory searches.

In my view, this also is a rule of law problem. Law should be understandable to the citizenry, not just lawyers. A reasonable citizen informed about the inventory-search exception and its purposes would expect it to apply, consistent with its purpose, *when an inventory is prepared*. That does not mean law enforcement officers must prepare a hyper-technical inventory that records every gum wrapper and piece of junk mail found in an impounded vehicle. Reasonableness is the guiding principle, of course. But officers must make some effort to record an individual's personal property such that the administrative purposes of protecting personal property and protecting law enforcement against allegations of theft or destruction of property are served. *See Cervantes*, 703 F.3d at 1141. Otherwise, the law starts to look like a word game that only lawyers and judges can play.

I agree with the court that the Fourth Amendment's reasonableness requirement, not an administrative policy, defines Anderson's constitutional rights. But governing precedent concerning the inventory-search exception establishes that an officer's reasonableness in this context is informed by their compliance with standard department policy governing inventory searches. *See Opperman*, 428 U.S. at 376 ("[I]n following standard police procedures, . . . the conduct of the police was not 'unreasonable' under the Fourth Amendment."); *Garay*, 938 F.3d at 1111 ("If [an inventory search is] done according to standardized criteria and not in 'bad faith or for the sole purpose of investigation,' police inventory procedures satisfy the Fourth Amendment." (quoting *Bertine*, 479 U.S. at 372)). That the deputies in this case had a proper community-caretaking purpose for

impounding Anderson's truck is not itself determinative of whether the search of the truck was reasonable under the Fourth Amendment. *See Johnson*, 889 F.3d at 1126–27; *Cervantes*, 703 F.3d at 1141 ("[A]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." (quoting *Wells*, 495 U.S. at 4)). And in my view, the Fourth Amendment is violated where officers are required to prepare a full inventory of the property found during a search of an impounded vehicle and they inventory only that property found that has evidentiary value such that the administrative purposes animating the inventory-search exception are subverted, and there otherwise is no indication that administrative purposes motivated the "inventory" search.

For these reasons, I respectfully dissent in part.