**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 20-50345 |
| *Plaintiff-Appellee,* | D.C. No. 5:20-cr-00071-RGK-1 |
| v. | |
| JONATHAN EDWARD CHARLES ANDERSON, AKA Johnathan Anderson, AKA Johnathan Edward Anderson, AKA Jonathan Charles Anderson, AKA Jonathan Edward Anderson, AKA Jonathan Edward Cha Anderson, AKA Jonathon Edward Anderson, AKA X Rage, | OPINION |
| *Defendant-Appellant*. | |

Appeal from the United States District Court
for the Central District of California
R. Gary Klausner, District Judge, Presiding

Argued and Submitted En Banc September 21, 2023
San Francisco, California

Filed May 2, 2024

Before:  Mary H. Murguia, Chief Judge, and Consuelo M. Callahan, Sandra S. Ikuta, Morgan Christen, John B. Owens, Daniel A. Bress, Danielle J. Forrest, Lawrence VanDyke, Gabriel P. Sanchez, Salvador Mendoza, Jr. and Roopali H. Desai, Circuit Judges.

Opinion by Judge Forrest;
Concurrence by Judge Mendoza, Jr.;
Dissent by Judge Bress

## SUMMARY[*]

### Criminal Law

The en banc court reversed the district court's denial of a motion to suppress a firearm found during a warrantless search of the defendant's truck in a case that presented the question whether an officer's failure to comply with governing administrative procedures is relevant in assessing the officer's motivation for conducting an inventory search.

The primary question was whether the deputies' deviation from the governing inventory procedure indicates that they acted in bad faith or solely for investigative purposes.  The en banc court held that an officer's compliance (or as is the case here, non-compliance) with department policy governing inventory searches is part of the totality of circumstances properly considered in

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

determining whether a search satisfies the requirements of the inventory-search exception to the warrant requirement.

Based on the circumstances presented here, the en banc court concluded that the deputies who searched the defendant's truck acted solely for investigatory reasons, and that the warrantless search therefore violated the Fourth Amendment.

Concurring, Judge Mendoza agreed with the majority's finding that the deputies' inventory search violated the Fourth Amendment. Writing separately to address an issue not reached by the majority, Judge Mendoza would reverse the district court's decision on the additional ground that the deputies lacked a valid community caretaking justification to impound the truck.

Dissenting, Judge Bress, joined by Judges Callahan, Ikuta, Owens, and VanDyke, wrote that the majority distorts the legal framework for inventory searches, contravenes decades of Supreme Court and circuit precedent, and turns hairsplitting distinctions into constitutional rules. Judge Bress wrote that although under settled law the validity of an inventory search depends on whether officers acted in bad faith or for the sole purpose of investigation, the majority instead holds that officers violated the Constitution because they did not follow the court's hyper-technical rules for filling out forms—which the deputies here had to do in the middle of the night after lawfully stopping a career criminal.

## COUNSEL

David R. Friedman (argued) and Elana S. Artson, Assistant United States Attorneys; Byron R. Tuyay, Assistant United States Attorney, Riverside Branch Office; Bram M. Alden, Assistant United States Attorney, Criminal Appeals Section Chief; Tracy L. Wilkison, Acting United States Attorney; United States Department of Justice, Office of the United States Attorney, Los Angeles, California; for Plaintiff-Appellee.

Ashwini S. Mate (argued), Deputy Federal Public Defender; Cuauhtemoc Ortega, Federal Public Defender; Federal Public Defender's Office, Los Angeles, California; for Defendant-Appellant.

## OPINION

FORREST, Circuit Judge:

Law enforcement may conduct warrantless inventory searches of impounded vehicles. But the Supreme Court has instructed that inventory searches are reasonable under the Fourth Amendment only if they are motivated by administrative purposes, and not solely by investigatory purposes. The question here is whether an officer's failure to comply with governing administrative procedures is relevant in assessing the officer's motivation for conducting an inventory search. The answer is yes. An officer's compliance (or as is the case here, non-compliance) with department policy governing inventory searches is part of the totality of circumstances properly considered in determining whether a

search satisfies the requirements of the inventory-search exception to the warrant requirement. And based on the circumstances presented here, we conclude that the deputies who searched Defendant Jonathan Anderson's truck acted solely for investigatory reasons. Therefore, we reverse the district court's denial of his motion to suppress.

## I.  BACKGROUND

At two o'clock in the morning, a San Bernardino County Sheriff's Department (SBCSD) deputy noticed Anderson's truck traveling in a high-crime area with a partially obstructed license plate in violation of California Vehicle Code § 5201. The deputy turned on his overhead lights to initiate a traffic stop, but Anderson accelerated and made a series of abrupt turns ending up on a dead-end street. The deputy called for backup, and Anderson ultimately pulled into a residential driveway and got out of his truck less than a minute into the encounter. Believing that Anderson was trying to flee, the deputy confronted him at gunpoint. Soon after, a second deputy arrived and handcuffed Anderson. Anderson said that he was parked in "a friend['s]" driveway and that his driver's license was expired. Dispatch confirmed that Anderson's license was expired and informed the deputies that Anderson was a career criminal. The deputies remarked that Anderson had a lot of money in his wallet and questioned why he had gloves and why his truck was wet.

Anderson repeatedly told the deputies that they could not search his truck. But the deputies responded that they had to tow and inventory his truck because he did not have a valid license. The parties agree on appeal that the owner of the home where Anderson parked did not know Anderson and wanted the truck removed. They dispute, however, whether the deputies knew this before they searched Anderson's

truck. According to Anderson, the first deputy began searching within seconds of learning Anderson's criminal history and then spoke with the homeowner after the search. The deputies claim they confirmed that the homeowner did not know Anderson before the search began. The parties agree that the deputies refused Anderson's request to have a friend come retrieve his truck.

During the purported inventory search, a loaded handgun under Anderson's driver's seat was found, and the deputies arrested Anderson for being a felon in possession of a firearm. The record indicates that between three and seven minutes elapsed from when the first deputy initiated the stop to when the gun was found.

The SBCSD has a standard procedure governing impounding and inventorying vehicles. The SBCSD Manual directs that deputies "shall[] [c]omplete two (2) CHP 180 forms . . . , including an inventory of *any* personal property contained within the vehicle." (Emphasis added.) The form requires deputies to record details about the ownership of the vehicle, the condition of the vehicle, and the towing company used. It also has a separate section entitled: "REMARKS (list property, tools, vehicle damage, arrests)."

The second deputy stayed at the scene to complete the CHP 180 Form after the first deputy transported Anderson to jail. The second deputy detailed the condition of the truck, including, for example, that it had front and rear seats, an ignition key, and a battery and that the tires were "worn." He also noted the registered owner and the towing company. But even though various items of personal property in addition

to the gun was contained in the truck, the "REMARKS" section of the form stated only:

> Veh pulled over for obstructed plate. Driver found to have expired CDL. *Upon inventory search firearm located.* Driver is convicted felon. Veh pulled into driveway to res. Owner of res. doesn't know driver[.] Veh has misc. scratches & dents 360°, damage to pass. door and tailgate.

(Emphasis added.) Nowhere did the deputy list Anderson's other personal property that included: (1) two pairs of Ray-Ban sunglasses, (2) an iPhone cord, (3) an Android phone charger, (4) a bottle of cologne, (5) a watch, (6) an audio speaker, and (7) tools. The deputy took photographs of the inside of the truck that showed some of Anderson's personal property, and the police report documented that a compact disc, gun, holster, and ammunition were found in the truck. But neither the photographs nor the police report was referenced or incorporated into the vehicle inventory form. And as the second deputy acknowledged, SBCSD's procedure does not allow personal property to be inventoried by photographs.

Anderson was charged with one count of unlawful possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). He moved to suppress the firearm and ammunition, arguing that the inventory search was unconstitutional because (1) the deputies lacked a valid "community caretaking purpose" when they searched his truck, (2) the impoundment violated California law, and (3) the deputies violated SBCSD's inventory procedures and

had an impermissible investigatory motive for conducting the search.

The district court heard testimony from the deputies and the homeowner and denied Anderson's motion. It found that Anderson did not have a valid driver's license and that the homeowner did not know Anderson or want Anderson's truck on his property. In assessing whether the deputies had a valid community caretaking purpose, the district court focused on "whether or not [the deputies] searched the car before or after they talked to the homeowner" and learned that he did not know Anderson. The district court noted that "there[] [were] a lot of discrepancies and inconsistencies in the testimony," but based on "credibility and looking at what [was] speculative and what [was] the evidence," it found that the record established the deputies did "talk to the homeowner before they searched the car."[1] The district court concluded that the search was reasonable without addressing whether the deputies complied with California law or SBCSD's inventory procedure or whether they had an impermissible motive for the search.

Anderson entered a conditional guilty plea reserving his right to appeal the suppression order, and the district court sentenced him to 77 months' imprisonment and three years' supervised release.

---

[1] The district court noted that even if the deputies did not talk to the homeowner first, the doctrine of inevitable discovery "may play a part in this." The Government does not rely on this doctrine on appeal, nor did it below. Therefore, because "[i]t is the government's burden to show inevitable discovery, . . . its failure to make the argument prevents us from upholding the denial of the suppression motion on that theory." *United States v. Ngumezi*, 980 F.3d 1285, 1291 (9th Cir. 2020).

## II. STANDARD OF REVIEW

We review a district court's denial of a motion to suppress de novo and its related factual findings for clear error. *United States v. Fisher*, 56 F.4th 673, 682 (9th Cir. 2022). We reverse a district court's factual findings that are "illogical, implausible, or without support in inferences that may be drawn from the record." *Ashker v. Newsom*, 81 F.4th 863, 878 (9th Cir. 2023) (quoting *Capistrano Unified Sch. Dist. v. S.W.*, 21 F.4th 1125, 1133 (9th Cir. 2021)). Where, as here, the district court does not make specific findings on a "factual issue relevant to the Fourth Amendment analysis, we 'uphold a trial court's denial of a motion to suppress if there was a reasonable view to support it.'" *United States v. Magdirila*, 962 F.3d 1152, 1156 (9th Cir. 2020) (quoting *United States v. Gooch*, 506 F.3d 1156, 1158 (9th Cir. 2007)).

## III. INVENTORY-SEARCH EXCEPTION

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. This protection was "crafted . . . as a 'response to the reviled "general warrants" and "writs of assistance" of the colonial era, which allowed British officers to rummage through homes in an unrestrained search for evidence of criminal activity.'" *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (quoting *Riley v. California*, 573 U.S. 373, 403 (2014)). "[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Lange v. California*, 141 S. Ct. 2011, 2017 (2021) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)); *see also Camara v. Mun. Ct. of City & County of S.F.*, 387 U.S. 523, 539 (1967). To meet this standard, law enforcement must

generally obtain a warrant based on probable cause before conducting a search. *See Mitchell v. Wisconsin*, 139 S. Ct. 2525, 2534 (2019). "But not always: The 'warrant requirement is subject to certain exceptions.'" *Lange*, 141 S. Ct. at 2017 (quoting *Stuart*, 547 U.S. at 403).

Vehicles are commonly impounded as part of law enforcement's "community caretaking functions." *South Dakota v. Opperman*, 428 U.S. 364, 368 (1976) (quoting *Cady v. Dombrowski*, 413 U.S. 433, 441 (1973)). "The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." *Id.* at 369. Inventory searches of impounded vehicles is a "well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). The reasons why the Supreme Court created this exception are borne out in the history leading to its recognition.

Development of the inventory-search exception began with the Supreme Court's observation that "[c]ommon sense dictates . . . that questions involving searches of motorcars or other things readily moved cannot be treated as identical to questions arising out of searches of fixed structures like houses." *Preston v. United States*, 376 U.S. 364, 366 (1964). In *Preston*, the defendant and two associates were arrested for vagrancy. *Id.* at 365. Their car was "towed to a garage" where officers searched it and found evidence of criminal activity. *Id.* at 365–66. In his subsequent bank-robbery prosecution, the defendant sought to suppress the evidence found in the car. *Id.* at 366. The government argued that the search was reasonable for investigative purposes—either as a search incident to a lawful arrest or a search based on probable cause that the car was stolen. *Id.* at 367–68. The Court rejected both arguments. Regarding search incident to

arrest, the Court explained that where the suspects had been taken into custody and the car was in police custody, there was neither danger that the suspects could use any weapons or destroy any evidence located in the car, nor that the car or its contents would be lost to law enforcement. *Id.*

A few years later, the Supreme Court recognized that law enforcement could search an impounded car without a warrant to protect the police. *Cooper v. California*, 386 U.S. 58, 61–62 (1967). In *Cooper*, the defendant was arrested for selling heroin and his car was impounded under a California law that required all vehicles used in narcotics trafficking to be seized pending forfeiture proceedings. *Id.* at 58, 60. The car was searched a week after the defendant's arrest, and evidence was found in the glove box. *Id.* at 58. California conceded that the search was not conducted incident to arrest but argued it was nonetheless reasonable. *Id.* at 60. The Court noted that, unlike in *Preston*, the impoundment in *Cooper* was related to the defendant's drug charge. *Id.* at 61. And it instructed that while "lawful custody of an automobile does not of itself dispense with constitutional requirements of searches thereafter made of it, the reason for and nature of the custody may constitutionally justify the search." *Id.* (internal quotation marks and citation omitted). The Court further concluded that "[i]t would be unreasonable to hold that the police, having to retain the car in their custody [pending forfeiture proceedings], had no right, even for their own protection, to search it." *Id.* at 61–62.

Next, in *Harris v. United States*, the Court upheld a warrantless vehicle search conducted under a department policy that sought to protect personal property located in impounded vehicles. 390 U.S. 234, 236 (1968). There, the defendant's car was traced after it was seen leaving the scene

of a robbery. *Id.* at 235. The defendant was arrested as he was getting in the car, and the car was impounded and towed to the police station with its windows open and doors unlocked. *Id.* Department procedure required officers to search impounded vehicles "thoroughly," "remove all valuables," and prepare a "property tag" and place it in the vehicle. *Id.* The arresting officer conducted the required search and secured the vehicle's windows and doors after it started to rain. *Id.* While securing the vehicle, the officer discovered evidence related to the robbery victim. *Id.* The Court upheld the search because "the discovery of the [evidence] was . . . the result of a . . . measure taken to protect the car while it was in police custody." *Id.* at 236.

The Court recognized a third administrative justification for inventorying impounded cars—concern for public safety. *Cady*, 413 U.S. at 447–48. In *Cady*, officers arrested the defendant for drunk driving after he wrecked his car. *Id.* at 435–36. The defendant told the officers that he was a Chicago police officer, and the officers believed that Chicago police were required to carry their service revolver at all times. *Id.* at 436. They looked for the defendant's revolver on his person and in the front seat and glove compartment of the car but did not find it. *Id.* The car was towed to a private, unguarded garage and parked outside. *Id.* Following department "standard procedure," an officer went to the garage where the defendant's car was towed to search for the service revolver, and he discovered evidence implicating the defendant in a murder. *Id.* at 436–38. Tying this case to *Harris* and *Cooper*, the Court again upheld the warrantless search:

> In *Harris* the justification for the initial intrusion into the vehicle was to safeguard the

> owner's property, and in *Cooper* it was to
> guarantee the safety of the custodians. Here
> the the [sic] justification, while different, was
> as immediate and constitutionally reasonable
> as those in *Harris* and *Cooper*: concern for
> the safety of the general public who might be
> endangered if an intruder removed a revolver
> from the trunk of the vehicle.

*Id.* at 447.

The Supreme Court brought all the justifications for inventorying impounded vehicles together in *Opperman*. 428 U.S. at 368–70. There, the defendant violated a city parking ordinance, and police impounded and towed his car when he was not present. *Id.* at 365–66. Seeing a watch on the dashboard and other personal property inside the car, an officer followed standard procedures and inventoried the property in the car, including the glovebox that contained marijuana. *Id.* at 366. When the defendant attempted to retrieve his car, he was arrested on drug charges. *See id.* The Court upheld the search, explaining: "In applying the reasonableness standard adopted by the Framers, this Court has consistently sustained police intrusions into automobiles impounded or otherwise in lawful police custody *where the process is aimed at securing or protecting the car and its contents*." *Id.* at 373 (emphasis added). The Court further explained that the practice of inventorying the contents of impounded vehicles "developed in response to three distinct needs: [1] the protection of the owner's property while it remains in police custody, [2] the protection of the police against claims or disputes over lost or stolen property, and [3] the protection of the police from potential danger." *Id.* at 369 (citations omitted). And the circumstances in *Cooper*,

*Harris*, *Cady*, and *Opperman* make clear that the searches the officers conducted in those cases were in service of the recognized administrative justifications for warrantless inventory searches. *See Illinois v. Lafayette*, 462 U.S. 640, 644 (1983) ("A so-called inventory search is not an independent legal concept but rather an incidental administrative step.").

A standard inventory procedure goes a long way in determining the reasonableness of a search. *Florida v. Wells*, 495 U.S. 1, 3–4 (1990). But the Supreme Court has been clear that not just any policy or practice will do. A proper "policy or practice governing inventory searches should be designed *to produce an inventory*," and if the policy or practice gives officers the ability to exercise discretion, the Fourth Amendment requires that the exercise of such discretion be "based on concerns related to the purposes of an inventory search." *Id.* at 4–5 (emphasis added). It naturally follows then that *the existence* of an inventory policy or practice is not itself sufficient to justify applying the inventory-search exception. Officers relying on a standard procedure to justify a search must not "act[] in bad faith or for the sole purpose of investigation." *Bertine*, 479 U.S. at 372; *see also United States v. Johnson*, 889 F.3d 1120, 1125 (9th Cir. 2018) ("[T]he purpose of the [inventory] search must be non-investigative; it must be 'conducted on the basis of something *other* than suspicion of evidence of criminal activity.'" (quoting *United States v. Torres*, 828 F.3d 1113, 1118 (9th Cir. 2016))). This is the rare context where the Fourth Amendment analysis is not purely objective—subjective motivations are material. *See Kentucky v. King*, 563 U.S. 452, 464 (2011) ("[W]e have never held, outside limited contexts such as an 'inventory search or administrative inspection . . . , that an officer's

motive invalidates objectively justifiable behavior under the Fourth Amendment.'" (quoting *Whren v. United States*, 517 U.S. 806, 812 (1996))); *Johnson*, 889 F.3d at 1125 (recognizing that "actual motivations *do* matter" in the inventory search context (citation omitted)). Plainly stated, "the exemption from the need for probable cause (and warrant), which is accorded to searches made for the purpose of inventory or administrative regulation, *is not accorded to searches that are not made for those purposes*." *Whren*, 517 U.S. at 811–12 (emphasis added).

## IV.  DISCUSSION

The parties presented two questions relevant to the search of Anderson's truck: (1) whether the deputies had a valid community-caretaking reason for impounding the truck, and (2) whether the inventory search was reasonable under the Fourth Amendment. We do not address the first question because we conclude that the Government did not meet its burden to show that the deputies conducted an inventory search.

It is the government's burden to prove that the Fourth Amendment is satisfied and the criteria for the inventory-search exception are met. *See Arkansas v. Sanders*, 442 U.S. 753, 759–60 (1979), *abrogated on other grounds by California v. Acevedo*, 500 U.S. 565 (1991) ("[T]he few situations in which a search may be conducted in the absence of a warrant have been carefully delineated and the burden is on those seeking the exemption to show the need for it." (internal quotation marks and citation omitted)); *see also Torres*, 828 F.3d at 1118 ("The government bears the burden of establishing that a vehicle's impoundment and search are justified under an exception to the warrant requirement."). Anderson argues that the inventory search of his truck was

invalid because the deputies' failure to create an inventory of his personal property, as required under SBCSD policy, evidences that they searched his truck for purely investigative reasons, not administrative reasons. Where a defendant challenges law enforcement's motivations for conducting an inventory search, the defendant must point to "objective evidence to suggest that the intrusion was not made for the purpose of enforcing the administrative inspection scheme." *Johnson*, 889 F.3d at 1126 (citation omitted). This production requirement does not, however, shift the ultimate burden of proof regarding application of the inventory-search exception to the defendant. Instead, when a defendant produces objective evidence of pretext, the court must assess the officers' subjective intent to determine whether the requirements of the inventory-search exception are met. *Id.*

### A.

The primary question is whether the deputies' deviation from the governing inventory procedure indicates that they acted in bad faith or solely for investigative purposes. The parties agree that SBCSD had a standard procedure for inventorying impounded vehicles. Anderson does not challenge the validity of this procedure *per se*. Rather, he argues that the deputies failed to follow the procedure to such a degree that they did not "produce an inventory" and, therefore, are not entitled to rely on the inventory-search exception. *Wells*, 495 U.S. at 4. The Government, on the other hand, argues that the deputies substantially complied with SBCSD's standard procedure, relying on our precedent upholding imperfect inventories. The Government also argues that "something more" than administrative error is necessary to prove that the deputies relied on the inventory-search exception as a pretext.

As explained, the inventory-search exception applies "where the process is aimed at securing or protecting the car and its contents." *Opperman*, 428 U.S. at 373. "[A]n inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Wells*, 495 U.S. at 4. And because an officer's subjective motivations have constitutional significance in this context, an officer's degree of compliance with the governing procedure is relevant in determining whether the officer acted in furtherance of administrative purposes or solely for investigatory purposes under the guise of conducting an inventory. The Supreme Court has explained that whether an officer conducts an inventory search "in accordance with *standard procedures* in the local police department . . . [is] a factor tending to ensure that the intrusion would be limited in scope to the extent necessary to carry out the caretaking function." *Opperman*, 428 U.S. at 375; *see also United States v. Garay*, 938 F.3d 1108, 1111 (9th Cir. 2019) (explaining that department "policies . . . assist courts to determine whether an inventory search is legitimate, as opposed to pretextual"). This is a matter of common sense. But it is not just the *existence* of a standard procedure, but also its *application*, that informs an officer's motives. It matters not that there is a standard procedure that cabins an officer's discretion if it is not followed.

Of course, inventory procedures need not "be conducted in a totally mechanical 'all or nothing' fashion." *Wells*, 495 U.S. at 4. An officer may exercise reasonable discretion in conducting inventory searches so long as such discretion is "exercised according to standard criteria" that serve the administrative goals of inventory searches, rather than solely to search for evidence. *Id.* (quoting *Bertine*, 479 U.S. at 375); *Torres*, 828 F.3d at 1120 (same). And perfect compliance

with standard criteria is not required. We previously have held that "minor noncompliance with department policies does not invalidate an otherwise lawful inventory search." *Magdirila*, 962 F.3d at 1157. But there is a limit to how far an officer can stray from a standard procedure that is adopted to serve the recognized administrative purposes underlying the inventory-search exception and still justify the search as a good-faith, administrative action. *Id.* The circumstances of this case force us to wrestle with the established principle that an inventory search that "materially deviate[s] from department policy can be invalid." *Id.*

It cannot be forgotten that the "purpose of [an inventory] search is *to* '*produce an inventory*' of the items in the car, in order 'to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger.'" *Johnson*, 889 F.3d at 1125 (emphasis added) (quoting *Wells*, 495 U.S. at 4). An officer's failure to create an inventory can, but may not always, suggest that something else drove the search. *Id.* at 1127–28. In the Fourth Amendment context, the facts matter. *See, e.g.*, *Lange*, 141 S. Ct. at 2018 (considering the totality of the circumstances when analyzing a warrantless intrusion). And our prior decisions upholding imperfect inventories are distinguishable from this case.

In *Garay*, the defendant led law-enforcement officers on a high-speed chase that ended when he crashed in a ditch. 938 F.3d at 1110. Before towing the defendant's totaled vehicle, the officers conducted an inventory search and found two loaded firearms, ammunition, and cell phones that they removed and booked into evidence. *Id.* Although the applicable inventory procedure required the officers to list the property found in the car on an inventory form, *id.* at

1111, they listed only the firearms, *id.* at 1110–11. But the officers noted on the form "that items of potential value were in the car before identifying and booking the items recovered from the car as 'evidence/property.'" *Id.* at 1112. The defendant challenged the inventory search because the officers failed to provide a complete property list, as required by their department procedure. *Id.* at 1111.

We disagreed, concluding that the officers had complied with the department procedure "in material respects." *Id.* at 1112. Where "the site was in effect a crime scene, the items in the car were sensibly treated as evidence." *Id.* at 1111–12. And we noted that the purposes of the inventory-search exception were served because "remov[ing] and safeguard[ing]" the contents of an impounded vehicle "is the essence of an inventory search." *Id.* at 1111. Because the officers recorded the required information about the tow, obtained an inventory file number, and "checked a box on the relevant inventory form indicating that items of potential value were in the car before identifying and booking the items recovered from the car as 'evidence/property,'" we concluded that the failure to prepare a complete list of the defendant's property on the inventory form "[wa]s not, on its own, a material deviation from policy." *Id.* at 1112.

Similarly, in *Magdirila*, officers impounded and searched a vehicle after the defendant admitted that he did not have a driver's license. 962 F.3d at 1154–55. The relevant department inventory procedure required officers to make an "accurate" inventory of the vehicle's contents on an inventory form, to list "[a]ll property," and to "be as thorough and accurate as practical in preparing an itemized inventory." *Id.* at 1155 (alteration in original). In the "REMARKS" section of the inventory form, the officer listed "IPHONE/APPLE WATCH" *and* cross-referenced the

police report. *Id.* On the referenced police report, the officer listed several more items, "including, but not limited to, a black backpack, air pistol, ink cartridges, USB flash drive, and an American Express credit card." *Id.* Although the officers did not provide a complete inventory on the inventory form itself, we held that they "complied substantially" with department procedure by incorporating the police report into the inventory report. *Id.* at 1158.

Taken together, these decisions establish that an incomplete inventory form is not *inherently* fatal. An incomplete inventory is valid if other actions taken by the officers indicate that they were acting, at least in part, for administrative reasons. *See Opperman*, 428 U.S. at 373 (noting the "Court has consistently sustained police intrusions into automobiles impounded . . . where the process is aimed at securing or protecting the car and its contents"); *Whren*, 517 U.S. at 811–12 (noting the inventory exception from warrant requirement only extended to searches made for administrative purposes).

Turning to the present case, we must determine if the facts demonstrate that the Government met its burden to show that the deputies were at least partially motivated by administrative purposes to search Anderson's truck, or whether they acted solely for investigative purposes. *See Johnson*, 889 F.3d at 1127. To begin with, it cannot reasonably be disputed that the deputies failed to inventory Anderson's personal property as mandated by SBCSD's standard procedure. SBCSD's procedure requires deputies to record "*any* personal property contained within the vehicle."[2] This is important because this policy, unlike

---

[2] The inventory report form also expressly instructs deputies to "list property[] [and] tools."

others that have been considered, does not afford deputies discretion to pick and choose what to inventory. *Cf. United States v. Garner*, 181 F.3d 988, 992 (8th Cir. 1999) (holding officer's failure to create an inventory list was not indicative of bad faith where the applicable procedure did not require the inventory search "be conducted in a particular manner"). Yet, the only item that the deputies here recorded and safeguarded was the firearm used as evidence against Anderson. They did not inventory a speaker, tools, two pairs of sunglasses, a watch, cologne, and other miscellaneous items. And unlike in *Garay* and *Magdirila*, the inventory report here did not otherwise record this omitted property. *See Garay*, 938 F.3d at 1112 ("[The officer] checked a box on the relevant inventory form indicating that items of potential value were in the car before identifying and booking the items recovered from the car as 'evidence/property.'"); *Magdirila*, 962 F.3d at 1158 (officers listed some items and incorporated the police report listing additional items); *see also Garner*, 181 F.3d at 991–92 (upholding inventory search where policy did not dictate manner of the inventory and the officer "did not complete a specific inventory form to document the items seized" because "the vehicle's contents were recorded in other ways," including "a towing report" and "property record"). Moreover, the deputies' identification of the firearm and ammunition taken from Anderson's truck as "evidence" on the crime report indicates that these items "were seized and treated specifically as evidence of a crime—not as property held for safekeeping." *Johnson*, 889 F.3d at 1128.

To begin with, the dissent dismisses our attention to SBCSD's policy because it contends that the governing inventory-search policy is irrelevant apart from its mere existence because such policies "do not define constitutional

rights." Dissent at 48. The dissent further contends that an officer's failure to comply with the terms of the governing policy cannot establish bad faith or pretext. These propositions are untenable as a matter of precedent and logic. If these propositions were true, the administrative purposes that an inventory policy must serve to be valid, *see Wells*, 495 U.S. at 4, would be rendered meaningless so long as the policy permitted an impoundment and inventory under the factual circumstances presented. This is inconsistent with the clear direction that an inventory policy's *application*, as well as its existence, is relevant to whether the inventory-search exception justifies a warrantless search. *See Opperman*, 428 U.S. at 375–76. And if courts ignore whether law enforcement officers comply with their department's policy "designed to produce an inventory," then officers will not have to serve the administrative purposes for which the inventory-search exception was created in conducting warrantless searches and instead will have a license to use inventory searches as "a ruse for a general rummaging in order to discover incriminating evidence." *Wells*, 495 U.S. at 4.

The Government and the dissent further argue that the lack of a complete property list on the inventory form the deputies prepared is immaterial because one of the deputies took photographs of the inside of Anderson's truck, which depict personal property found in the truck. SBCSD's procedure does not contemplate inventory-by-photograph, but regardless, the photographs did not record all the property found in the truck. And different from *Garay* and *Magdirila*, there is no indication that the photographs were made part of the administrative inventory record. Rather, the photographs were part of the separate investigative police

report,[3] which was not referenced in the inventory report. This is not a meaningless technicality, as the dissent suggests. It is relevant in assessing the deputies' motivation because it indicates that the photographs were treated as evidence. *See Johnson*, 889 F.3d at 1127–28 (the officers and government attorneys' actions made clear the search was investigatory). There is no indication that SDCSD's crime reports are maintained in a manner to ensure the safekeeping of personal property and to protect the department against claims of theft or loss, and we cannot assume that they are.

The Government also argues that the incomplete inventory report is immaterial because the deputy who prepared the form could have decided to list only the firearm because he saw nothing else of "significant value" in the truck. This is unpersuasive. As discussed, SBCSD's inventory-search policy does not give deputies discretion to decide what property should be listed. Additionally, the record belies the Government's argument that Anderson's property was not inventoried because it was deemed not to have sufficient value. The deputy who prepared the inventory form in this case listed tools and other items like those he found in Anderson's truck on inventory reports that he prepared in other cases.

Finally, the dissent contends that our analysis of the inventory search is inconsistent with *Bertine*, where the Supreme Court upheld an inventory search that omitted valuable items from the inventory. The inventory policy at issue in that case "mandated a detailed inventory involving

---

[3] The property listed in the police report also was limited to items with apparent evidentiary value—a holster, a firearm, and ammunition. And the police report describes the photographs as "digital photographs of the vehicle, the obstructed license plate and the firearm located."

the opening of containers and the listing of [their] contents," and the primary question posed was whether officers could open closed containers as part of an administrative inventory search. *Bertine*, 479 U.S. at 370 (alteration in original). The Court concluded that closed containers could be searched in an inventory and further noted that "there was no showing that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation." *Id.* at 372. No doubt, the inventory prepared in that case was far from complete. *See id.* at 383 (Marshall, J., dissenting). But the point is not that the deputies here prepared an incomplete inventory, as in *Bertine* and other cases that we have discussed. The point is that they inventoried only the evidence used to convict Anderson. Those were not the circumstances in *Bertine*. There, the officers did inventory non-evidentiary "items found in the vehicle," including "jumper cables, a tire, a shovel, and some sandbags." *People v. Bertine*, 706 P.2d 411, 413 (Colo. 1985) (en banc), *rev'd*, 479 U.S. 367 (1987). Stated another way, our concern with the deputies' inventory here does not go to their competence, but to their purpose.[4] *See Johnson*, 889 F.3d at 1125–26.

---

[4] The dissent reads *Bertine* as suggesting that major deviations from governing inventory policy are permissible, but that was not the issue the Supreme Court confronted in that case. While the Colorado lower courts addressed whether the "somewhat slipshod" manner of the inventory search comported with federal and state constitutional requirements, the Colorado Supreme Court premised its ruling on the federal constitution alone and concluded that searches of closed trunks and containers violated the Fourth Amendment. *Bertine*, 479 U.S. at 369–70. In reversing the Colorado Supreme Court, *Bertine* held that an officer, pursuant to a standard inventory policy, may open closed containers during a routine inventory search. *Id.* at 374 ("We conclude that here, as in *Lafayette*, reasonable police regulations relating to inventory

The bottom line is simple: the deputies' recording of a single item used as evidence, despite SBCSD's procedure requiring that they inventory "*any* personal property contained within the vehicle" was not mere "minor" or "slipshod" noncompliance. *Bertine*, 479 U.S. at 369; *Magdirila*, 962 F.3d at 1157. It was a material deviation from SBCSD's standard inventory procedure, *see Magdirila*, 962 F.3d at 1157, and the "inventory" that they produced was incapable of serving the *non-investigative* purposes of protecting an owner's personal property and protecting officers against accusations of theft or loss of an owner's property, *see Opperman*, 428 U.S. at 369. This combination is relevant in assessing the deputies' motives for searching Anderson's truck and strongly suggests that they acted for purely investigatory reasons.[5]

---

procedures administered in good faith satisfy the Fourth Amendment."); *see id.* at 376 (Blackmun, J., concurring). Justice Marshall dissented because in his view there was no standardized criteria to guide the officers' discretion in deciding whether to impound the vehicle or allow it to be parked and locked, and no criteria guiding what items need to be inventoried. *Id.* at 379–81 (Marshall, J., dissenting). The disputed question, therefore, was whether the governing department policy allowed for unfettered police discretion. *Id.* When Justice Marshall discussed the slipshod inventory, *id.* at 382, he did so to make the point that only one of the three governmental interests described in *Opperman*—protecting an owner's property in police custody—might justify any automobile inventory search, and that even that factor did not justify the search in *Bertine* because of how deficient it was, *id.* at 384. In short, the *Bertine* court did not confront the question presented here—whether major deviations from the governing administrative policy inform the officers' subjective motivations.

[5] It is undisputed that the deputies searched Anderson's truck for investigatory reasons. The dispute is whether this was their *sole* reason

**B.**

Other circumstances surrounding the search, considered in the totality, also suggest that the deputies were not motivated to search Anderson's truck for administrative purposes. *See Lange*, 141 S. Ct. at 2018. The deputies decided to impound Anderson's truck because he did not have a valid license. Before the search began, the deputies had discovered what they viewed as a "[l]ot of . . . money" in Anderson's wallet (around two hundred dollars), questioned why Anderson had gloves and why his truck was wet, and learned from dispatch that he was a career criminal. The deputies clearly were suspicious that Anderson had engaged in criminal behavior.

When the search was conducted, the deputies had not arrested Anderson, although he was detained in handcuffs in one of the deputy's vehicles. These circumstances are different from those presented in the Supreme Court's cases upholding inventory searches where law enforcement arrested the defendant *before* searching the vehicle. *See, e.g.*, *Cooper*, 386 U.S. at 58, 60–62 (vehicle impounded at arrest and searched days later); *Harris*, 390 U.S. at 235 (vehicle impounded at arrest and searched after it was towed to the police precinct); *Cady*, 413 U.S. at 435–36 (defendant was arrested and jailed for DUI before his wrecked car was impounded); *Bertine*, 479 U.S. at 368–69 (search conducted after defendant arrested for DUI); *see also Garay*, 938 F.3d

---

for searching. Much of what the dissent focuses on in concluding that the deputies acted for an administrative purpose relates to the impoundment of the truck—a seizure. But here we are concerned with the search of the truck. A seizure and a search are different acts, which implicate different interests. *See Segura v. United States*, 468 U.S. 796, 806 (1984) ("A seizure affects only the person's possessory interests; a search affects a person's privacy interests.").

at 1110 (car impounded after defendant crashed following a high-speed chase).

Additionally, the deputies conducted the search almost immediately after they discovered a basis for impounding Anderson's truck. *Cf. Cooper*, 386 U.S. at 60–62; *Harris*, 390 U.S. at 235; *Cady*, 413 U.S. at 436–37 (search was conducted after vehicle was towed); *Wells*, 495 U.S. at 2 (same); *Johnson*, 889 F.3d at 1123 (search conducted after tow ordered). And the deputies did not remove or otherwise secure Anderson's personal property for safekeeping. *Cf. Harris*, 390 U.S. at 235 (closed the vehicle's windows to protect against rain per departmental procedure and saw evidence of a crime in plain view); *Opperman*, 428 U.S. at 366 (deputy inventoried and removed defendant's personal property for safekeeping).

By themselves, these facts have limited force, but where Anderson was secured in the back of a patrol car and there was no immediate exigency related to securing the truck and its contents, they are part of the totality informing whether the "inventory" search conducted here was an excuse "to rummage for evidence." *Garay*, 938 F.3d at 1111. There may be cases where the surrounding circumstances are inconsistent with the conclusion that law enforcement was acting for investigatory purposes such that the lack of a property inventory may be insufficient to demonstrate a purely investigative motive, but that is not this case.

The dissent argues that the ordering of events is of no moment because there are numerous cases where inventory searches were upheld when the search occurred before the defendant was arrested. None of the authority the dissent cites on this point is from the Supreme Court. And the dissent is incorrect to suggest that the ordering of events

surrounding an inventory search is irrelevant. In *Opperman*, for example, the Supreme Court specifically noted in support of its conclusion that the officers were searching for administrative purposes that "[t]he inventory was conducted only after the car had been impounded" and the owner was not present to arrange "for the safekeeping of his belongings." 428 U.S. at 375. The Fourth Amendment inquiry is always based on the totality of the circumstances—inventory searches are no exception.

For these reasons, the district court's conclusion that the deputies' warrantless inventory search was valid is not supported by the record. *Ashker*, 81 F.4th at 878; *see also Magdirila*, 962 F.3d at 1156 (absent specific factual findings related to the Fourth Amendment issue, there must be a reasonable view to support a district court's denial of a motion to suppress).

\* \* \* \* \*

The Fourth Amendment, not policies governing administrative searches, defines the constitutional right against unreasonable searches and seizures. But given the nature of the inventory-search exception to the warrant requirement, law enforcement's compliance with the governing inventory procedure or policy can be material. To satisfy the Fourth Amendment, an inventory search must serve administrative, not solely investigatory, goals. *Bertine*, 479 U.S. at 371–72. And whether law enforcement officers have complied with their governing inventory procedure can inform their motivations for conducting an inventory search. *See Opperman*, 428 U.S. at 376 ("[I]n following standard police procedures, . . . the conduct of the police was not 'unreasonable' under the Fourth Amendment."); *Garay*, 938 F.3d at 1111 ("If [an inventory search is] done according to

standardized criteria and not in 'bad faith or for the sole purpose of investigation,' police inventory procedures satisfy the Fourth Amendment." (quoting *Bertine*, 479 U.S. at 372)). Accordingly, deviation from the governing inventory policy can evidence bad faith or that officers were acting solely for investigative purposes.

The dissent laments that Anderson "goes free" as a result of our decision. Dissent at 38. But, of course, one does not lose his Fourth Amendment rights upon being convicted of a felony—or even multiple felonies. And we do not enforce the Fourth Amendment based on whether an underlying conviction will be invalidated. *See Riley*, 573 U.S. at 401 ("We cannot deny that our decision today will have an impact on the ability of law enforcement to combat crime. . . . Privacy comes at a cost.").

**REVERSED and VACATED.**

---

MENDOZA, Circuit Judge, concurring:

After pulling Jonathan Anderson over, police officers performed a warrantless inventory search of his truck and found a firearm underneath his driver's seat. Mr. Anderson maintains that this search violated the Fourth Amendment because (1) the deputies lacked a valid community caretaking justification to impound Mr. Anderson's truck, and (2) their subsequent inventory search was unreasonable under the Fourth Amendment. The majority only reaches the latter issue, addressing whether the deputies' inventory search violated the Fourth Amendment, correctly finding that it did. I write separately to address the community caretaking question. As with so many Fourth Amendment

issues, determining whether the community caretaking exception applies in this case is a fact-intensive inquiry. Although we owe great deference to the trial court's finding of fact, when it makes a clear error that impacts its legal analysis, we are obligated to correct it. Here, the trial court made such an error, and I would reverse its decision on this basis as well.

## I.

Deputy Daniel Peterson noticed Mr. Anderson driving with a partially obstructed license plate at around 2:00 a.m. on November 13, 2019. After Mr. Anderson sped into a residential neighborhood, the deputy initiated a traffic stop and called for back-up. Mr. Anderson drove about a thousand feet, pulled into a driveway, exited his truck, and tossed his keys onto the front lawn. Deputy Peterson drew his gun and ordered Mr. Anderson to get on his knees. While Mr. Anderson complied with the deputy's orders, a second officer, Deputy Kyle Schuler, arrived and placed Mr. Anderson in handcuffs. Mr. Anderson told the deputies that he was parked in "a friend['s]" driveway and that his driver's license was expired. Deputy Peterson called dispatch, which relayed that Mr. Anderson was a "career criminal." Meanwhile, Deputy Schuler searched through Mr. Anderson's wallet; asked him why he had a "lot of . . . money" in it; questioned him about his truck, which appeared freshly washed, and commented on the gloves that Mr. Anderson was wearing.[1]   All this interaction and discussion occurred *before* any contact was made with the

---

[1] As the majority notes, the clear implication of these questions was that Deputy Schuler suspected Mr. Anderson of criminal behavior, well before the search of his truck.

owner of the home where Mr. Anderson had parked,
Mr. Michael Wallace.

At some point later, Deputy Schuler spoke with
Mr. Wallace who asked the deputies to remove
Mr. Anderson's truck from his driveway.   According to
Mr. Anderson, this conversation occurred after Deputy
Peterson had already searched his truck and found the
firearm.  But the government contends that Deputy Schuler
spoke to Mr. Wallace before the search began.  The district
court resolved this factual dispute in favor of the
government, noting that the "only evidence before [it] at
[the] time, other than speculation, from the testimony of the
witnesses, is that [the deputies] did talk to the homeowner
before they searched the car."  For the reasons explained
below, this finding is clearly erroneous.

## II.

Although we owe great deference to a trial court's
factual findings—particularly when, like here, the district
court takes testimony on the subject, *United States v.
Craighead*, 539 F.3d 1073, 1082 (9th Cir. 2008)—we need
not affirm a "clearly erroneous" decision if we are "left with
the definite and firm conviction that a mistake has been
committed," *United States v. Hinkson*, 585 F.3d 1247, 1260
(9th Cir. 2009) (en banc) (cleaned up).  We reverse a district
court's finding if it is "illogical, implausible, or without
support in inferences from the record."  *Oakland Bulk &
Oversized Terminal, LLC v. City of Oakland*, 960 F.3d 603,
613 (9th Cir. 2020).  We should not cosign a district court
finding that is contradicted by objective evidence and
common sense.

The court's finding that the officers spoke to the
homeowner before searching Mr. Anderson's car is clearly

erroneous for two reasons.  First, the court's finding requires us to believe that the deputies questioned Mr. Anderson, placed him in the back of the patrol car, spoke with the homeowner, located the firearm, and called it in to dispatch in roughly two minutes.  In my view, this is an implausible timeline of events, given the testimony and verifiable dispatch log and audio recording.   Second, the district court's proffered explanation—that there was no nonspeculative evidence that the deputies searched the vehicle before speaking to Mr. Wallace—is unsupported by the record.  *See, e.g.*, *Reber v. United States*, 951 F.2d 961, 969 (9th Cir. 1991) (finding that mischaracterization of evidence constitutes clear error).  Contrary to the district court's suggestion, there was more than mere speculation in the record that the officers searched the vehicle before speaking to Mr. Wallace.

Based on Deputy Peterson's audio recording and dispatch log,[2] we know that Deputy Schuler could not have spoken to Mr. Wallace until after 2:06:36 a.m.[3]  We also know that Deputy Peterson found the gun in Mr. Anderson's car and reported its serial number to dispatch at 2:08:46 a.m.

---

[2] To construct an accurate timeline of events, we reviewed (1) Deputy Peterson's audio-belt recording, which was translated into a roughly five-minute transcript, and (2) the dispatch log bearing a timestamp for Deputy Peterson's calls to dispatch.  Viewing these two records together, we can deduce the timing of events that are heard in the belt recording.

[3] The record reflects that Deputy Peterson called dispatch to inquire about Mr. Anderson's expired license two minutes and thirty-nine seconds (2:39) into Deputy Peterson's belt recording—which corresponds with the 2:04:48 a.m. mark of the dispatch log.  Using these datapoints as a baseline, and running the clock concurrently, we know that Deputy Schuler spoke to Mr. Anderson until around 2:06:36 a.m., before leaving to speak with Mr. Wallace.

If we were to adopt the district court's factual finding—that Deputy Schuler spoke with Mr. Wallace before Deputy Peterson searched the truck—then the following events would have had to occur in a two minute and ten second window: (1) the deputies lead Mr. Anderson, who was vocally objecting to the search of his truck, to the back of the patrol car; (2) Deputy Schuler walked up the driveway to the front door of Mr. Wallace's house; (3) he knocked twice on the door; (4) he woke Mr. Wallace in the middle of the night; (5) he waited for Mr. Wallace to wake up and answer the door; (6) he spoke to Mr. Wallace, who confirmed that he did not know Mr. Anderson; (7) he signaled to Deputy Peterson to search the truck; (8) Deputy Peterson acknowledged the signal, and searched Mr. Anderson's truck; (9) Deputy Peterson found a gun underneath the driver's seat; (10) he located the car's serial number and read it, at night; and (11) he called the serial number in to dispatch.

Even after giving special deference to the district court's credibility determinations, *Craighead*, 539 F.3d at 1082, that timeline of events is, simply put, implausible. Particularly when Mr. Wallace testified that it took him at least a minute or two to wake up and answer the door. He also testified that he spoke to Deputy Schuler for approximately three to five minutes, and that he did not see Deputy Schuler signal to Deputy Peterson. After being questioned about the accuracy of his recollection of these details, Mr. Wallace stated: "I'm positive, I'm sure." Even if Mr. Wallace overestimated the length of time it took him to wake up and answer the door, which is certainly possible, the district court's finding of fact inexplicably allots a matter of seconds for Mr. Wallace to jump out of bed in the middle of night to give officers the green light to search Mr. Anderson's truck. His testimony is

direct, *non-speculative* evidence that the deputies did not speak to him *before* searching Mr. Anderson's truck.

The record also shows that Deputy Peterson called dispatch to inquire about Mr. Anderson's expired license at 2:04:48 a.m.  Mr. Anderson submitted an affidavit attesting that Deputy Peterson entered and searched his truck without permission at 2:06:19 a.m.[4]  According to the district court's finding of fact, the deputies had not yet spoken to Mr. Wallace at this point.  In fact, Deputy Schuler can still be heard speaking to Mr. Anderson, and it would be another two minutes and twenty-seven seconds before Deputy Peterson called dispatch to report the firearm at 2:08:46 a.m.

There are two explanations for why Mr. Anderson can be heard objecting to a search of his truck prior to the moment when the court determined that the deputies had spoken to Mr. Wallace: either the deputies had predetermined that they would search Mr. Anderson's truck *before* confirming whether it was in fact legally parked, or they had already begun to search the truck and the court's factual finding is incorrect.  Either way, Mr. Anderson's declaration, combined with the belt recording and dispatch log, is direct, *non-speculative* evidence that the search occurred before the officers spoke to Mr. Wallace, and that the officers were motivated by investigatory rather than administrative purpose.

Taken together, the direct, disinterested testimony of Mr. Wallace and the unimpeachable dispatch log and audio

---

[4] This is an imputed time, based on Mr. Anderson's declaration that the search began four minutes and ten seconds (4:10) into the belt recording, around the same time Mr. Anderson can be heard objecting to a search of his truck.

recording amount to more than mere speculation. Even if the court discredits Mr. Wallace's testimony and Mr. Anderson's attestations, the court is still left with a finding of fact that leads to an implausible timeline of events. For all these reasons, I am left with the "firm conviction" that the district court's finding that the deputies spoke to Mr. Wallace before searching the truck is clearly erroneous. *Hinkson,* 585 F.3d at 1260.

## III.

The district court's factual finding led to the conclusion that the deputies had a valid exception to the warrant requirement to seize and search Mr. Anderson's truck. Finding that the deputies spoke to Mr. Wallace *after* searching Mr. Anderson's truck compels us to conclude otherwise. Warrantless searches and seizures "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967). The community caretaking exception is one such exception, allowing officers to seize vehicles that pose a hazard to other drivers, impede the flow of traffic, or are targets of vandalism or theft. *See Miranda v. City of Cornelius*, 429 F.3d 858, 864 (9th Cir. 2005). Officers may not use this exception, however, as a pretext to investigate suspected criminal activity, *see Cady v. Dombrowski*, 413 U.S. 433, 441 (1973), because "[t]he police's authority to search and seize property when acting in its role as 'community caretaker' has a different source than its authority to search and seize property to investigate criminal activity," *Miranda*, 429 F.3d at 863. As is true in the case of any warrantless search and seizure, "the government bears the burden" of proving an exception applies, *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2010), and this

burden is a "heavy" one, *United States v. Howard*, 828 F.2d 552, 555 (9th Cir. 1987) (reasoning that the government's burden cannot be "satisfied by speculation"); *see also Cervantes*, 703 F.3d at 1142 n.1 (collecting cases).

The government contends that Deputy Schuler spoke to Mr. Wallace before the search began. Adopting this version of events, the district court held that the deputies had a valid community caretaking justification to impound Mr. Anderson's truck, search his vehicle, and locate the firearm underneath the driver's seat. *See United States v. Torres*, 828 F.3d 1113, 1119 (9th Cir. 2016) (holding that a community caretaking seizure is justified to "promote other vehicles' convenient ingress and egress to the parking area"). But the court's factual finding is clearly erroneous for the reasons explained above, and based on the facts in the record, I find that the officers did not speak to Mr. Wallace until after searching the vehicle. Thus, at the time deputies searched Mr. Anderson's truck, they had no basis to disprove Mr. Anderson's claim that he was parked at a friend's house, and therefore, had no community caretaking reason to impound and search his truck. *See Miranda*, 429 F.3d at 866 (holding that a community caretaking seizure is unjustified when "the location of the vehicle does not create any need for the police to protect the vehicle or to avoid a hazard to other drivers").

Though the deputies *later* discovered a valid community caretaking purpose to seize the truck, the facts show that the deputies did not have a valid administrative purpose *at the moment* they decided to search Mr. Anderson's truck.[5] *See Miranda*, 429 F.3d at 864 (holding that in assessing whether

---

[5] As the majority correctly notes, the doctrine of inevitable discovery is waived.

a seizure was justified by the community caretaking exception, "we must examine whether this seizure is reasonable based on all of the facts presented"). The government may not rely on post-hoc justifications to meet its heavy burden of proving an exception to the warrant requirement; particularly when the deputies were purportedly acting under a community caretaking function, which the Supreme Court has described as being "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady*, 413 U.S. at 441. Permitting otherwise would endorse a search-first-and-find-ample-justification-later approach that is incompatible with our well-established precedent. *See Byars v. United States*, 273 U.S. 28, 29 (1927) ("A search prosecuted in violation of the Constitution is not made lawful by what it brings to light[.]"); *United States v. Taheri*, 648 F.2d 598, 600 (9th Cir. 1981) (holding that to permit "post hoc justification[s] for using information that had [] been illegally obtained . . . would encourage police officers to ignore the dictates of the fourth amendment in conducting initial investigations").

## IV.

By the time the deputies began their investigatory relay race, Mr. Anderson was safely handcuffed, posing no threat to himself or others, his car was turned off and safely parked in a driveway, and the deputies were under full control of the situation. The district court found that the deputies spoke to the homeowner before they searched the truck, leading the court to conclude that the community caretaking exception applied. That finding was erroneous, and counter to witness testimony, the verifiable evidence, and, frankly, common sense. Thus, lacking a factual edifice, the government failed to meet its burden of demonstrating that the deputies'

subsequent search was motivated by a valid community caretaking purpose. In addition to the reasons outlined in the majority, I would reverse the district court's decision below on the ground that the government also failed to establish that the community caretaking exception applied.

---

BRESS, Circuit Judge, with whom CALLAHAN, IKUTA, OWENS, and VANDYKE, Circuit Judges join, dissenting:

Jonathan Anderson, a six-time convicted felon, had a loaded gun in his truck. This meant serious federal charges and a surefire conviction. But today Anderson goes free. The en banc court holds that evidence of the gun should be suppressed because police violated the Fourth Amendment when preparing the inventory form for Anderson's validly impounded vehicle. In so ruling, the court distorts the legal framework for inventory searches, contravenes decades of Supreme Court and circuit precedent, and turns hairsplitting distinctions into constitutional rules.

Under settled law, the validity of an inventory search depends on whether officers acted in bad faith or for the sole purpose of investigation. With an inspector's clipboard, the majority instead holds that officers violated the Constitution because they did not follow the court's new hyper-technical rules for filling out forms—which the deputies here had to do in the middle of the night after lawfully stopping a career criminal. The touchstone of the Fourth Amendment is reasonableness. In scrutinizing the minutiae of officer paperwork, the majority loses sight of this core constitutional principle. This decision is not only wrong as a matter of law but will seriously jeopardize public safety,

invalidating entirely lawful searches and resulting convictions, just like those here.

I respectfully dissent.

## I

I begin with the majority's warping of the legal standards. Until today's decision, those standards were very clear.

Inventory searches of automobiles are a longstanding exception to the Fourth Amendment's warrant requirement. *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). When police lawfully impound a vehicle, as they did here, they may conduct an inventory search pursuant to a standardized policy. *Id.* at 375–76; *see United States v. Mancera-Londono*, 912 F.2d 373, 375–76 (9th Cir. 1990). In this context, an individual's expectation of privacy as to the contents of his vehicle—which is a "diminished expectation of privacy" to begin with—is outweighed by the "strong governmental interests" in "protect[ing] an owner's property while it is in the custody of the police," "insur[ing] against claims of lost, stolen, or vandalized property," and "guard[ing] the police from danger." *Bertine*, 479 U.S. at 372; *see also Illinois v. Lafayette*, 462 U.S. 640, 647 (1983); *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976).

When officers act pursuant to a valid standardized policy—which they indisputably did here—an inventory search will be upheld unless it is conducted "in bad faith or for the sole purpose of investigation." *Bertine*, 479 U.S. at 372. That is the legal standard that has governed us for many, many years. "[R]easonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment," the Supreme Court has held.

*Id.* at 374.   As we have said, "[i]f done according to standardized criteria and not in 'bad faith or for the sole purpose of investigation,' police inventory procedures satisfy the Fourth Amendment." *United States v. Garay*, 938 F.3d 1108, 1111 (9th Cir. 2019) (quoting *Bertine*, 479 U.S. at 372).

Critically, because "a department's policies do not define constitutional rights," we have held that "the failure to complete an inventory form does not invalidate an inventory search." *Id.* at 1111–12.   Instead, to establish bad faith there must be "something else" beyond the asserted non-compliance with an inventory policy's administrative requirements.   *Id.*   at 1112 (quotations omitted).   And because police are prohibited only from conducting inventory searches for the "*sole* purpose" of investigation, a search is not vitiated simply because *a* motive for the search is crime detection: "Importantly, 'the mere presence of a criminal investigatory motive or a dual motive—one valid, and one impermissible—does not render'" an inventory search invalid.   *United States v. Magdirila*, 962 F.3d 1152, 1157 (9th Cir. 2020) (quoting *United States v. Johnson*, 889 F.3d 1120, 1126 (9th Cir. 2018) (per curiam)).   These are the principles and foundations on which the bad faith inquiry rests.

Curious then, that the majority does not recite the usual "bad faith" test until almost halfway into its opinion.   The majority opinion instead begins by claiming that "[t]he question here is whether an officer's failure to comply with governing administrative procedures is relevant in assessing the officer's motivation for conducting an inventory search." But that facially modest question is not at all the question the majority goes on to answer.   Instead, the majority treats the deputies' compliance with department inventory search

policies—and the specific requirement to write items on an inventory form—as dispositive. The majority tells us that "[t]o satisfy the Fourth Amendment, an inventory search must serve administrative, not solely investigatory, goals." And because the deputies did not list enough items on the inventory form, the majority concludes that "the 'inventory' that they produced was incapable of serving the *non-investigative* purposes of protecting an owner's personal property and protecting officers against accusations of theft or loss of an owner's property." All of this explains why despite opening with an unassuming question of "relevance," we are later told midway through the opinion that the question is actually much different: "The primary question is whether the deputies' deviation from the governing inventory procedure indicates that they acted in bad faith or solely for investigative purposes."

What is happening here is a not-so-subtle shifting of the legal inquiry. In orienting its analysis around deputies' compliance with one part of their department's inventory search policy, the majority's opinion massively alters the long-established "bad faith" test. By marrying the officers' non-compliance with departmental policy with whether the resulting inventory "serve[s] the administrative purposes for which the inventory-search exception was created," the majority has effectively turned non-compliance with inventory search procedures into the test for bad faith. The majority is not requiring a showing that the deputies acted in bad faith through actions *beyond* non-compliance with their department's administrative procedures. *But see Garay*, 938 F.3d at 1112 (making clear that "something else" is required). The majority is instead examining whether an inventory that results from such non-compliance is serving

the purposes of the administrative search exception.  That has *never* been the inquiry.

Indeed, it contradicts long-settled law.  In *Bertine*, the Supreme Court's seminal precedent on inventory searches, police prepared a "somewhat slipshod" inventory, 479 U.S. at 369, that, among other things, "failed to list $150 in cash found in respondent's wallet or the contents of a sealed envelope marked 'rent,' $210, in the relevant section of the property form," made "no reference to other items of value, including respondent's credit cards, and a converter, a hydraulic jack, and a set of tire chains, worth a total of $125," and failed to include the "$700 in cash found in respondent's backpack, along with the contraband."  *Id.* at 383 (Marshall, J., dissenting).

If the test were whether this inventory served the non-investigative purposes of an inventory search, as the majority here claims, *Bertine* should have come out the other way.  Indeed, that was the view of the *Bertine* dissent, which followed the majority's same rationale in concluding that the officer's "inventory . . . would not have protected the police against claims lodged by respondent, false or otherwise."  *Id.* But this was decidedly not the view of the *Bertine* majority, which held that "reasonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment."  *Id.* at 374.  The test, in other words, is whether the officers acted in good faith, not whether (as the majority claims) the inventory they produced serves the purposes of the inventory search exception.

By reorienting the inquiry into the officers' compliance with departmental policy, the majority runs roughshod over our longstanding precedent—which the majority does not expressly overrule—as well as the precedent of the other

circuits.  As we previously held, "[t]hat [an] officer did not complete the inventory list that ordinarily would be completed as part of a department inventory search is not, on its own, a material deviation from policy." *Garay*, 938 F.3d at 1112.  Instead, "[t]here must be something else; something to suggest the police raised 'the inventory search banner in an after-the-fact attempt to justify' a simple investigatory search for incriminating evidence." *Id.* (quoting *United States v. Rowland*, 341 F.3d 774, 780 (8th Cir. 2003)).  Indeed, as we favorably pointed out in *Garay*, "[o]ther circuits have expressly recognized that the failure to complete an inventory form does not invalidate an inventory search." *Id.* (citing, *e.g.*, *United States v. Loaiza-Marin*, 832 F.2d 867, 869 (5th Cir. 1987) (per curiam); *United States v. Trullo*, 790 F.2d 205, 206 (1st Cir. 1986); *United States v. O'Bryant*, 775 F.2d 1528, 1534 (11th Cir. 1985)); *see also, e.g.*, *United States v. Williams*, 777 F.3d 1013, 1016 (8th Cir. 2015); *United States v. Cartwright*, 630 F.3d 610, 616 (7th Cir. 2010).  "[I]t is a long leap from the proposition that following regular procedures is some evidence of lack of pretext to the proposition that failure to follow regular procedures *proves* (or is an operational substitute for) pretext." *Whren v. United States*, 517 U.S. 806, 816 (1996).  But it is that latter proposition that the court embraces today.

The majority also commits a further legal error in holding that "[i]t is the government's burden to prove that the Fourth Amendment is satisfied and the criteria for the inventory-search exception are met."  This statement is overbroad and only partially correct as it pertains to this case.  It is the government's burden to show that the threshold criteria for the inventory search exception are met, namely, that there was a sufficient community caretaking reason for impounding the vehicle and that the police

department had a sufficiently standardized inventory search policy. *See, e.g.*, *United States v. Cervantes*, 703 F.3d 1135, 1141 (9th Cir. 2012) (government must establish community caretaking function for the impoundment); *United States v. Johnson*, 936 F.2d 1082, 1084 (9th Cir. 1991) (government must establish the existence of a sufficiently standardized inventory search policy).

But when the allegation is that the officers who performed the inventory search did so in bad faith, we have said that it falls to the defendant to "produce[] evidence that demonstrates the officers would not have searched and seized items from the car he was driving but for an impermissible motive." *Johnson*, 889 F.3d at 1126; *see also id.* at 1135 (Paez, J., specially concurring) (a defendant "may only succeed in challenging the [inventory] search . . . by showing that [the officer's] search was motivated by an 'investigatory police motive'") (quoting *United States v. Banks*, 482 F.3d 733, 741 (4th Cir. 2007)); *see also United States v. Orozco*, 858 F.3d 1204, 1213 (9th Cir. 2017) (permitting, in analogous administrative search context, inquiry into an officer's subjective motivations "where the defendant has come forward with objective evidence to suggest that the intrusion was not made for the purpose of enforcing the administrative inspection scheme"). As the First Circuit has recognized, our circuit holds that "the burden is on the defendant" to prove pretext. *United States v. Sylvester*, 993 F.3d 16, 24 n.6 (1st Cir. 2021) (citing, *inter alia*, the Ninth Circuit's decisions in *Johnson* and *Orozco*); *see also Banks*, 482 F.3d at 741 (explaining that "Banks may only succeed in challenging the search of the bags, then, by showing that Det. Gunn's search was motivated by an 'investigatory police motive,'" and upholding the inventory search because "Banks presented no evidence that Det. Gunn

initiated the search of the bags or conducted the inventory search because he suspected that he would find incriminating evidence therein"); *United States v. Maestas*, 2 F.3d 1485, 1491 (10th Cir. 1993) (explaining that for border checkpoint stops, which are administrative searches in which officer subjective motivation is relevant, "the defendant bears the burden of proving that a legally sufficient basis asserted as a justification for a search or seizure was pretextual"); 6 Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 11.2(b) (6th ed. 2022) (explaining that most Fourth Amendment pretext cases suggest that the defendant has the burden to show pretext).

The majority opinion cites the standard rule that "the burden is on those seeking the exemption [from the warrant requirement] to show the need for it." *Arkansas v. Sanders*, 442 U.S. 753, 760 (1979) (quoting *United States v. Jeffers*, 342 U.S. 48, 51 (1951)). But that default rule does not extend to what the majority agrees is the rare context in which an officer's subjective motivations are relevant. *See Kentucky v. King*, 563 U.S. 452, 464 (2011) ("[W]e have never held, outside limited contexts such as an 'inventory search or administrative inspection . . . , that an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment.'") (quoting *Whren*, 517 U.S. at 812). In that situation, it is the party making the claim of bad faith who should naturally bear the burden of proving it. It is not, as the majority appears to suggest, the burden of law enforcement officers to prove a negative.

The majority acknowledges our precedents holding that the defendant must "come forward with objective evidence to suggest that the intrusion was not made for the purpose of enforcing the administrative inspection scheme." *Johnson*, 889 F.3d at 1126 (quoting *Orozco*, 858 F.3d at 1212–13).

But the majority then asserts, without any citation, that "[t]his production requirement does not, however, shift the ultimate burden of proof regarding application of the inventory-search exception to the defendant."  We have never suggested there is any distinction in this area between the defendant's burden of proof and his burden to come forward with evidence showing pretext.  It is unclear from the majority opinion if the burden of proof on the bad faith issue now lies with the government or with no one.  But it is clear it no longer lies with the person who always bore it until today: the defendant.  This is yet another point of law in the majority opinion where our previously clear legal standards have now become scrambled.

## II

Applying the proper legal standards, it is obvious that the deputies complied with the Fourth Amendment and that the gun found during the search of Anderson's truck should not be suppressed.  Deputies validly detained Anderson after he sped away from a lawful traffic stop and upon learning that Anderson had an expired license and was a career criminal (he had six prior felony convictions).  Deputies had a valid basis for impounding Anderson's vehicle because Anderson lacked a valid driver's license and was parked in the driveway of a random home on a dead-end street, with the homeowner telling deputies he wanted Anderson's truck removed.  The truck had to be towed, and so deputies, under department policy, had to perform an inventory search.

Indeed, they explicitly told Anderson this was what they were doing before commencing the search.[1]

There is no indication that the deputies conducting the inventory search were operating "in bad faith or for the sole purpose of investigation." *Bertine*, 479 U.S. at 372. And it is simply remarkable for the majority to conclude that the deputies' search was not even "at least partially motivated by administrative purposes"—that everything the deputies did that night in searching the truck and documenting their findings was somehow a giant ruse to cover up an improper investigatory objective.

None of this is consistent with law. The majority's holding turns on fine-grained criticisms of how the deputies documented what was in the truck and the order in which they handled matters. But the Fourth Amendment does not elevate such technicalities into constitutional prohibitions. In blaming the officers for their skills in filling out paperwork in the middle of the night, the majority ushers in

---

[1] Anderson also challenges the inventory search on the ground that the officers, in the first place, lacked a valid community caretaking purpose for impounding his vehicle. He claims that deputies searched his truck before talking to the homeowner on whose driveway the truck was parked. The deputies, in contrast, maintain they did not search the truck until after the homeowner told them he did not know Anderson and wanted the truck removed. Because the majority does not reach this issue, I do not address it further except to note that I would hold that the impoundment of Anderson's vehicle was valid. After hearing testimony at a suppression hearing, the district court found that the deputies spoke to the homeowner before searching the truck. The district court's factual finding was not clearly erroneous. *United States v. Hylton*, 30 F.4th 842, 846 (9th Cir. 2022). "Review under the clearly erroneous standard is significantly deferential, requiring for reversal a definite and firm conviction that a mistake has been committed." *Id.* That standard is not met here.

a jurisprudence of silly faults that will confound courts and impede the valid enforcement of our criminal laws.

### A

The majority's central problem with the officers' conduct is the degree to which they deviated from departmental policy in preparing the inventory form. It bears repeating that the majority's intense focus on this issue is seriously misplaced and contrary to precedent that the majority never says it is overturning. A department's inventory policies "do not define constitutional rights," so "the failure to complete an inventory form does not invalidate an inventory search." *Garay*, 938 F.3d at 1111–12. And because "administrative errors should not, on their own, invalidate inventory searches," "there must be something else" to suggest that the inventory search was pretextual. *Id.* at 1111–12 (quoting *Rowland*, 341 F.3d at 780). That is the clear teaching of *Bertine*, *Garay*, and so many other cases. The majority therefore seriously errs in claiming that the "primary question" in this case concerns "the deputies' deviation from the governing inventory procedure."

But even under the majority's misguided view that compliance is king, the government should still prevail. The San Bernardino County Sheriff's Department policy requires officers when impounding vehicles to fill out a California Highway Patrol (CHP) 180 vehicle report. I am attaching as Appendix A to this dissent the form that was filled out in this case. The deputies who prepared the form took substantial efforts in doing so.

On the CHP 180 form, which indicates that it was filled out shortly after 2:00 a.m., deputies checked numerous boxes reflecting the condition and contents of Anderson's

truck.  They noted, for instance, that the truck contained front and rear seats, two radios, and a battery, but lacked a tape deck, tapes, a registration form, or a camper.  Deputies initially marked down that Anderson's truck contained an ignition key, but then revised the form to reflect that it did not.  Deputies complied with the department's requirement to "[o]btain the signature, date, and time of the arrival of the tow truck driver," recording those details on the form.  In the form's "Remarks" section, which directs officers to "List Property, Tools, Vehicle Damage, Arrests," deputies wrote that Anderson's vehicle displayed "misc. scratches & dents 360°" and "damage to pass. door and tailgate," sketching the location of those imperfections on graphics of a generic vehicle that are printed at the bottom of the form.  In the same section, in addition to chronicling the circumstances of Anderson's arrest, they also wrote: "upon inventory search firearm located."  Did the officers write all of this down as a cover for their pretext and bad faith?

And that was just the CHP 180 form.  A deputy also took five photos of the interior of Anderson's truck, which he testified were taken in part for the purpose of inventorying the contents of the vehicle.  I am attaching these photos as Appendix B to this dissent.  The photos depict the front seats and back seats of the truck, with close-ups of the driver and passenger sides.  The photographs depict a speaker, an iPhone cord, a Ray-Ban sunglasses box, a lint roller, a box of tampons, stray papers, and various pieces of trash, including empty water bottles, a Dr. Pepper can, and a half-finished glass bottle of Starbucks Frappuccino.  Officers referenced the photos in their police report prepared on the same day, describing them as "several digital photographs of the vehicle."  Officers also booked as "property/evidence" a CD containing the photographs, along with the holster of

Anderson's gun. They booked the gun itself and the ammunition it contained under the separate category of "gun." Was it pretextual and in bad faith for the officers to take photos documenting the interior of Anderson's truck and to then note, in a formal police report, that they had done so?

Looking for fault wherever it can be found, the majority finds some. The majority first seizes upon the fact that the department's policy states that officers should include on the CHP 180 form "an inventory of any personal property contained within the vehicle." See, says, the majority: "*any* property." We know this is critical to the majority because its opinion italicizes the word "*any*" three times, every time it quotes the policy. We are thus told it is significant that the CHP 180 form omitted other property in Anderson's truck, such as a speaker, an iPhone cord, tools, an Android phone charger, sunglasses, a watch, cologne, and "other miscellaneous items."

The majority's analysis is fundamentally misdirected. Is the majority opinion really suggesting that officers acted in bad faith because they did not include *every* item in the truck on the inventory form? The answer appears to be yes because the majority explicitly rejects the theory that the inventory search policy has any value limitation, because, after all, it does say "*any* personal property." So it would apparently be just as problematic if officers had listed the sunglasses but neglected to include the lint roller, if they had mentioned the cologne but not the box of tampons. What about all the trash? Like many people, Anderson had a lot of stuff in his vehicle. The message to convicted felons in San Bernadino is that if they want to drive armed, it is best to have a very messy car. But is the officers' failure to inventory every single item at two o'clock in the morning

truly the basis for a finding of *bad faith*, by which a six-times-over convicted felon will avoid a 77-month federal sentence for unlawfully possessing a loaded gun?   This vision of the Fourth Amendment is unrecognizable to me.

Of course, a closer inspection of the items that the majority lists shows that many were in fact accounted for.  The speaker and iPhone cord are clearly visible in the photographs that a deputy took of the interior of Anderson's truck.  Although the sunglasses are not themselves shown in the photographs, a Ray-Ban sunglasses box plainly is.  Another photo may depict a bag of tools (the bag is in the distinctive shape of a jack handle set for removing tires).  The majority criticizes the deputies for not listing on the form "other miscellaneous items," but many such items are seen in the photographs.  The deputy who prepared the form testified that he did not recall seeing a watch.  Anderson's fiancée, who the next day accompanied him to the tow yard to pick up the truck, did not recall a watch being in the truck when they retrieved it, nor did she allege a watch was missing.

That leaves us with an Android charger (Anderson's fiancée didn't recall that either) and a bottle of cologne (which, by the way, was partially empty).  These items were of minimal value.  The majority's rejoinder is, once again, that the department's policy requires "*any*" property to be inventoried and "does not give deputies discretion to decide what property should be listed."   But the test here is not whether officers failed to comply with the inventory policy.  *See Garay*, 938 F.3d at 1111–12.  The items we are talking about wouldn't go for much at a garage sale.  Yet they are now Fourth Amendment linchpins.

But let's return to the photographs that the deputy took. The photos clearly show the deputy's effort to document items contained in the truck. The photos are not limited to illegal items (*i.e.*, the gun), and they depict items that the majority faults the officers for omitting from the CHP 180 form. But the photographs, too, turn out to be wholly insufficient. The problem, the majority tells us, is that the photographs "did not record all the property found in the truck," the department's procedure "does not contemplate inventory-by-photograph," and "there is no indication that the photographs were made part of the administrative inventory record."

But the simple answer to this under the Fourth Amendment is: who cares? The question we are trying to answer is whether deputies conducting the inventory search acted in bad faith or for the sole purpose of investigation. *Bertine*, 479 U.S. at 372. Taking imperfect photos in the dark does not violate the Constitution. That deputies recorded items through photographs rather than jotting them down is also of zero constitutional significance. The department policy that the majority references does not say inventories can be performed through photography, but neither does it say photographs may not be used. Indeed, photographs are often the best way to memorialize things (think how many times we pull out our phones and snap quick photos). The majority takes pains to point out that the deputies did not formally reference the photos on the CHP 180 form. But can this case really turn on the deputies' supposedly grave misdeed of not scribbling the notation "see photos" on the form? Nothing in the Fourth Amendment requires that officers creating vehicle reports use the majority's preferred citation conventions.

Equally misplaced is the majority's treatment of the police report. The majority claims that "the deputies' identification of the firearm and ammunition taken from Anderson's truck as 'evidence' on the crime report indicates that these items 'were seized and treated specifically as evidence of a crime—not as property held for safekeeping.'" (quoting *Johnson*, 889 F.3d at 1128). Although the majority implies this shows deputies were not conducting a true inventory search and were merely rooting for evidence, the very crime report on which the majority relies specifically states a page earlier that the gun and ammunition were found "[w]hile conducting a vehicle inventory." The majority's description of the police report as conveying that the gun and ammunition were obtained "specifically as evidence of a crime" is simply inaccurate.

Regardless, once the deputies located the gun and ammunition, they were of course fully entitled to treat them as evidence of a crime, which they were. The majority's suggestion that deputies would only be performing an inventory search if they later held all items for "safekeeping," but not as evidence, is clearly wrong. The deputies validly treated as evidence of a crime those items that Anderson could not lawfully possess. The rest of the items in the truck were held for "safekeeping," and there is no suggestion any of these items were lost. The majority is thus incorrect in claiming that "the only item" the deputies "safeguarded" was Anderson's firearm. *All* of Anderson's items were safeguarded. That they were safeguarded in different ways is of no constitutional moment.

The majority further concludes that the deputies' attachment of the photographs to the crime report is evidence of "the deputies' motivation because it indicates that the photographs were treated as evidence." But the photographs

we are talking about did not contain direct evidence of any crime. They were simply photographs of Anderson's personal effects—a photographic inventory of the inside of the truck. Indeed, the deputies specifically testified that the photographs were taken for "both" inventory and evidentiary purposes. Photographs of items located during an inventory search will often have evidentiary value for a criminal investigation. If the entirely commonplace referencing of those photographs in a crime report implies that the precipitating search was not a true inventory search, countless inventory searches are now infirm.

The majority assures us that "an incomplete inventory form is not *inherently* fatal"—phew!—and that "[a]n incomplete inventory is valid if other actions taken by the officers indicate that they were acting, at least in part, for administrative reasons." The majority's own stated test is easily met here. How can the majority possibly maintain that the deputies were not acting, even *in part*, for administrative reasons? The truck had to be towed. Before that, it could be searched. Deputies filled out the CHP 180 form and took photos of Anderson's personal property when inventorying the truck. The photos were then referenced in the police report. And the police report itself referenced the CHP 180 form and the fact of the inventory search. If all this legitimate law enforcement activity is not even evidence of a *partial* administrative purpose, what would be?

The majority focuses on the fact that the CHP 180 form did not reference the photos or the police report. But the idea that the outcome of this case depends on which records reference the other has no basis in principle or precedent. A Fourth Amendment doctrine that turns on such minutiae fails to respect Supreme Court and Ninth Circuit precedent, elevating dead-of-night box-checking, document cross-

referencing, and the like into legal mandates, and, improbably, telltale signs of officer bad faith. Trivial distinctions are now the difference in whether the criminal laws may be enforced against guilty violators. That is both legally unsound and a dangerous state of affairs.

B

It should be clear that the majority's decision is not consistent with precedent. Indeed, it is a major departure from existing law.

In *Bertine*, which I discussed above, the police department's policy "require[d] a detailed inspection and inventory of impounded vehicles." 479 U.S. at 369. Yet the Supreme Court upheld the inventory search even though the officer failed to list over $1,000 in cash found in three separate locations in the vehicle, as well as credit cards and various types of tools. *See id.* at 383 (Marshall, J., dissenting). In the Supreme Court's view, however, "there was *no showing* that the police, who were following standardized procedures, acted in bad faith or for the sole purpose of investigation." *Id.* at 372 (emphasis added).

The majority in a lengthy footnote tries to argue that *Bertine* involved other issues. But there is no escaping the basic point that by the logic of today's opinion, *Bertine* was wrongly decided. If, as the majority says, a highly significant "major deviation" from department policy occurred here, how could that not be true in *Bertine*, too? By the majority's reasoning, the constitutional infirmity in the *Bertine* inventory search should have been glaring. Indeed, it was—to the *Bertine* dissent. *See id.* at 383 (Marshall, J., dissenting).

Here, moreover, the majority's departure from *Bertine* extends not only to *Bertine*'s bottom-line result but to its basic reasoning. *Bertine* reiterated that the Fourth Amendment does not turn on "fine and subtle distinctions," and that "the real question is not what [officers] could have . . . achieve[d] but whether the Fourth Amendment *requires* such steps." *Id.* at 374, 375 (quotations omitted). The majority opinion is at odds with these basic precepts of Fourth Amendment law, elevating deficient form-filling to grounds for suppression, a "last resort" remedy. *Hudson v. Michigan*, 547 U.S. 586, 591 (2006).

The majority opinion also contradicts our prior (and not overruled) decisions in *Garay* and *Magdirila*. The majority implies that this case is unique because deputies "inventoried only the evidence used to convict Anderson." That is of course not even true: the majority can make this assertion only by ignoring the photographs, which the deputies testified were taken as part of the inventory process and which depict most of the personal items at issue in the truck. But even setting that aside, officers listing only the illegal firearms on the inventory form was the very factual situation in *Garay*, our leading precedent in this area.

In *Garay*, as here, an officer listed only firearms on an inventory form, even though the department's policy required a listing of all the property found inside the vehicle. 938 F.3d at 1110–11. We refused to find bad faith or pretext because the officer "obtained the tow truck driver's signature and noted the date and time of the driver's arrival," "obtained a file number for the inventory," "checked a box on the relevant inventory form indicating that items of potential value were in the car," and booked "the items recovered from the car as 'evidence/property.'" *Id.* at 1111–12.

Similarly, in *Magdirila*, the department's policy required an "accurate" inventory of "all property in a stored or impounded vehicle," but we were again unphased by the officer's non-compliance.  962 F.3d at 1155.  We instead found it "considerably" clear that the officer did not act in bad faith when the inventory form "included some of the property" in the defendant's car and when the form mentioned the police report, which recorded the rest.  *Id*. at 1158.

The majority purports to distinguish *Garay* and *Magdirila* because the officers in those cases alluded to other items on the inventory form—in *Garay* by checking a box on the form indicating there were items of potential value in the car, and in *Magdirila* by referencing a police report, which listed the items.  But the majority thereby makes the classic mistake of taking facts from other cases and converting them into a legal rule—here one that is in fact contrary to the basic logic of the decisions from which the supposed rule emerged.

That officers in *Garay* and *Magdirila* checked boxes or referenced other documents was in those cases supportive of a lack of bad faith, but these ways of filling out forms are by no means constitutional imperatives.  Indeed, *Garay* treated the officer's failure to list anything but the guns on an inventory form as a mere "administrative error[]," finding it inconsequential because "the failure to complete an inventory form does not invalidate an inventory search." 938 F.3d at 1112.  As Judge Berzon has explained, "*Garay* held that the lack of any inventory is an insufficient reason to invalidate the inventory search."  *Magdirila*, 962 F.3d at 1159 (Berzon, J., concurring).  The majority opinion instead reimagines *Garay* and *Magdirila* to support its intense focus

on the specific way in which inventory forms are filled out, ignoring the core principle of those cases.

In this case, of course, the deputies *did comply* with their department's inventory search policy in material respects: among other things, and as in *Garay*, they filled out the CHP 180 forms, documented the arrival of the tow truck driver, and submitted the forms.  *See Garay*, 938 F.3d at 1112.  And even working off the majority's misguided belief that photographs are not permitted under the department's inventory policy, if the purpose of the inventory form is to know what items are in the vehicle, it cannot be disputed that the photographs did, in fact, produce an inventory of items in the truck.  It was not a perfect inventory.  But the majority agrees perfection is not required.

Contrary to the majority opinion, I do not discount the relevance of the deputies' compliance with inventory search procedures as part of the overall bad faith inquiry.  There is nothing new in that basic point; we said it in *Garay*.  *See id.* at 1111.  But what the majority is hyper-scrutinizing is *not* the deputies' broader compliance with the inventory search policy, but their technical non-compliance with one aspect of it: listing items on the form.

The majority holds that the officers' failure to list items on the form was "a material deviation" from department policy.  But in *Garay*, we said the opposite: "That the officer did not complete the inventory list that ordinarily would be completed as part of a department inventory search *is not*, on its own, a material deviation from policy."  938 F.3d at 1112 (emphasis added).  The majority says that when the deputies here did not fully fill out the form, "the 'inventory' that they produced was incapable of serving the *non-investigative* purposes of protecting an owner's personal property and

protecting officers against accusations of theft or loss of an owner's property." Setting aside that the photographs accomplished those same objectives, *Garay* is again to the contrary. In *Garay*, we affirmed that "the failure to complete an inventory form *does not* invalidate an inventory search," and that to establish bad faith there must be "*something else*" beyond the asserted non-compliance with an inventory policy's administrative requirements. *Id.* at 1111–12 (emphasis added; quotations omitted). The majority thinks this is "untenable" as a matter of logic, but the logic here is elemental: "a department's policies do not define constitutional rights." *Id.* at 1111. By word and by deed, the majority opinion holds otherwise.

The majority's entire analysis therefore betrays the supposedly soft question of "relevance" that it claims to be resolving. By the majority's reasoning, deputies' compliance with the inventory search policy—and with the specific requirement that items in a vehicle be written down on a form—is now the be-all and end-all of the constitutional analysis. How else to explain the pages upon pages of dissection into what information was recorded on what form, why the photographs are insufficient, and how different documents that the deputies prepared do not expressly reference others? Why else are we considering the supposed constitutional significance of half empty bottles of cologne, stray tools, cell phone chargers, and random trash? Adjudging officer pretext on such trifles—and by that metric, overturning valid convictions—is a grave mistake of law.

C

Perhaps recognizing the infirmity of its analysis of the CHP 180 form and photographs, the majority opinion briefly

attempts to claim there are "other circumstances" in this case that "suggest" improper pretext.  The majority does not tell us that this analysis is necessary to its decision, even though our case law is clear that "[t]here *must be* something else" besides non-compliance with department inventory search policy to invalidate an inventory search.  *Garay*, 938 F.3d at 1112 (emphasis added; quotations omitted).  Even so, the majority's limited analysis of the "other circumstances" only confirms the degree to which the majority is departing from established law.

The majority first asserts that this case is unique because by the time the deputies searched the truck, they "clearly were suspicious that Anderson had engaged in criminal behavior."  But the majority opinion completely ignores that in the inventory search context, settled precedent holds that "the mere presence of a criminal investigatory or dual motive—one valid, and one impermissible—does not render" the search invalid.  *Magdirila*, 962 F.3d at 1157 (quoting *Johnson*, 889 F.3d at 1126); *see also, e.g.*, *Garay*, 938 F.3d at 1112; *United States v. Bowhay*, 992 F.2d 229, 231 (9th Cir. 1993); *United States v. Feldman*, 788 F.2d 544, 552 (9th Cir. 1986), *as amended*.  As we said in *Garay*, "[g]iven the circumstances leading up to the search, the officers no doubt expected to find evidence of criminal activity inside the vehicle[,] [b]ut that expectation would not invalidate an otherwise reasonable inventory search."  938 F.3d at 1112.  The test is not whether officers had *a* criminal investigatory purpose, but whether this was their "*sole* purpose."  *Bertine*, 479 U.S. at 372 (emphasis added).  This test is not remotely met here.  In chastising officers for their entirely human and permissible dual purpose, the majority opinion contravenes clearly established law.

The majority also claims that this case is different from prior cases because the deputies did not arrest Anderson until after they completed the inventory search. Some past inventory search cases did indeed involve post-arrest searches. But many other cases have upheld inventory searches when they were conducted *before* the defendant was arrested—just like here. In *Magdirila*, for instance, the officers performed the inventory search while the defendant was detained, only arresting him after finding drugs in the car. 962 F.3d at 1154–55. This search-preceding-arrest fact pattern is true of other cases upholding inventory searches. *See, e.g.*, *United States v. Rivera*, 988 F.3d 579, 580–81 (1st Cir. 2021) *United States v. Nevatt*, 960 F.3d 1015, 1018–19 (8th Cir. 2020) (per curiam); *United States v. Mundy*, 621 F.3d 283, 286 (3d Cir. 2010); *United States v. Maier*, 691 F.2d 421, 422 (8th Cir. 1982).

The majority ironically claims that the Supreme Court's decision in *Opperman* supports its sequencing theory, but there too officers conducted the inventory search *before* making the arrest. *See Opperman*, 428 U.S. at 366–37 (describing how an inventory search was conducted and "[r]espondent was subsequently arrested"). To be sure, the search in *Opperman* was conducted after the car was impounded and the owner not present. *Id.* at 375. But the Supreme Court certainly did not hold this was a necessary sequencing of things, or that this sequencing mattered at all. Once again, the majority is taking the facts of a case and implying a legal rule that does not exist.

In short, the majority cites no case inferring pretext from the ordering of the inventory search vis-à-vis the arrest, for the likely reason that nothing about that sequencing is so inevitably revealing. The majority seems to imply that officers would be motivated to conduct an inventory search

to enable an arrest.  But if officers had already arrested a person, one could imagine them rummaging through his vehicle to bolster the arrest just made or out of a settled belief that the defendant was a criminal wrongdoer.  Courts have upheld inventory searches regardless of whether the arrest was made before or after the inventory search, underscoring that no single inference from the ordering of events is more appropriate than the other.

Equally misplaced is the majority's focus on the fact that deputies conducted the search "almost immediately" after deciding to impound the vehicle, before towing Anderson's truck.  The decision to tow here was no afterthought.  It was made at the outset, with deputies telling Anderson they were going to have his vehicle towed before they began searching it.  That the deputies conducted the inventory search soon after deciding to impound the truck is also not indicative of any kind of nefarious intent on the deputies' part.  To the extent the majority is suggesting that deputies had to call in the tow before doing anything else, no law or departmental policy required that.  *See United States v. Woolbright*, 831 F.2d 1390, 1395 (8th Cir. 1987) ("Reasonableness, and not any rigid chronological formula, is the hallmark of a proper inventory search.").  And once Anderson's vehicle could be properly impounded, nothing required the officers to wait around before conducting the inventory search.  The truck was parked on a stranger's driveway at night in a residential neighborhood.  The deputies could decide it would be best to resolve the situation as quickly as possible.

In addition, and although the majority gives it little play, the government has a legitimate interest in conducting inventory searches to promote safety, *see Bertine*, 479 U.S. at 372; *Cooper v. California*, 386 U.S. 58, 61–62 (1967), and no rule of law prevented deputies from furthering that

interest in a prompt manner.  In this case, that interest was fully validated: deputies found a loaded gun with the safety turned off.  It is entirely unclear why the majority is implying it would have been better if the readied firearm had remained undetected in the truck for longer, including until the tow truck driver arrived.  *See Feldman*, 788 F.2d at 553 (upholding inventory search when it "ensure[d] the immediate protection of the public's safety").

The majority cites our decision in *Johnson* as an example of a case where the search was conducted after the tow was ordered, *see* 889 F.3d at 1123, the appropriate ordering of things, in the majority's view.  It is not clear that the majority's description of the facts of *Johnson* is even accurate (the case made nothing of the supposed distinction that the majority finds relevant).  But in *Johnson*, we determined (based on damning officer admissions) that the challenged search *was* pretextual.  *Id.* at 1127–28.  This only confirms that the majority is drawing entirely unwarranted significance from the fact that deputies searched the truck before ordering the tow.

The same can be said of the majority's reliance on the fact that deputies "did not remove or otherwise secure Anderson's personal property for safekeeping."  Here, of course, the property was secured: it was kept in the vehicle, and the majority does not suggest any property was lost.  Nor were officers required to remove the property from the car.  In a case about an allegedly unlawful search, it is somewhat ironic for the majority to be recommending that the property be more intrusively seized as well.  But the basic answer to this, as with so much of the majority opinion, is that the Fourth Amendment is not an edict of inventory search etiquette.  The deputies certainly could have removed the

items from the truck.  But they did not act in bad faith by not doing so.

Of course, the real tell of the entire last part of the court's opinion is that even the majority admits that "by themselves," the "other circumstances" it points to "have limited force."  The majority nonetheless thinks these "other circumstances" have more than limited force here because "Anderson was secured in the back of a patrol car and there was no immediate exigency related to securing the truck and its contents."  But "immediate exigency" is not a requirement for an inventory search.  And there clearly was some exigency here: the car was blocking a random person's home in the middle of the night and a tow truck was coming. I fail to understand why the majority is insisting that a truck containing a loaded gun with the safety turned off first be transported to an impound lot, where it could become lost or stolen or present any manner of danger.  Nor can we infer pretext from the fact that the deputies detained Anderson. The detention was quite understandable: Anderson had just fled from police during a lawful traffic stop, requiring a deputy to stop him at gunpoint.

"In the Fourth Amendment context, the facts matter," the majority intones.  But what guidance does today's opinion give when facts that have concededly "limited force" take on outsized significance based on events that, from a Fourth Amendment perspective, are themselves otherwise unremarkable? The majority's "other circumstances" are the kind that occur every day in the field.  They have never been regarded as evidence that officers engaged in a pretextual inventory search.

And if we need further proof of that, the majority's own analysis confirms it.  For all the discussion of "other

circumstances," by the logic of the majority's decision, if the deputies had just listed more items on the inventory form, taken better photos, or referenced the photos in the "remarks" section of their write-up, none of these "other circumstances" would matter: the search would apparently be proper.   That only underscores the infirmity of the analytical foundation on which the court's opinion rests.

\*     \*     \*

In imposing new constitutional prohibitions premised on hairline distinctions, the court's opinion breaks with established precedent, replacing Fourth Amendment reasonableness with a new matrix of judicially created inventory search rules unmoored from the traditional bad faith inquiry.  Vexing for the courts who will need to apply it, the majority's decision will prove even more unfortunate for communities that depend on the even-handed enforcement of the criminal laws.

Appendix A

CHP 180 Form

3-ER-359

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

**VEHICLE REPORT**
CHP 180 (Rev. 4-16) OPI 061

NOTE: CHP 180 IS FURNISHED TO ALL PEACE
OFFICERS BY THE CALIFORNIA HIGHWAY PATROL

3-ER-359

| REPORTING DEPARTMENT | LOCATION CODE | DATE / TIME OF REPORT | NOTICE OF STORED VEHICLE DELIVERED PERSONALLY | FILE NO. |
|---|---|---|---|---|
| SBCSO    26 | 3600 | 11/13/19  0217 | | 0719034497 |

| LOCATION TOWED / STOLEN FROM | ODOMETER READING | VIN CLEAR IN SVS? ☑YES ☐NO | DATE / TIME DISPATCH NOTIFIED | LOG NO. |
|---|---|---|---|---|
| SUNRISE BLVD / CHAPPAREL CT | | LIC. CLEAR IN SVS? ☑YES ☐NO  11/13/19 / 0217 | | |

| YEAR | MAKE | MODEL | BODY TYPE | COLOR | LICENSE NO. | ☐ONE  MONTH/YEAR  STATE |
|---|---|---|---|---|---|---|
| 04 | CHEV | COLORADO | PU | SILV | 46890M1 | ☑TWO   01/20   CA |

| VEHICLE IDENTIFICATION NO. | ENGINE NO. | VALUATION BY ☑OFFICER ☐OWNER |
|---|---|---|
| 1 G C C S 1 9 6 3 4 8 1 2 1 3 6 1 | — | ☐0-600 ☑601-4000 ☐4001+ ☐$ 4K |

| REGISTERED OWNER | ☑SAME AS R/O | LEGAL OWNER |
|---|---|---|
| KEVIN BROWN | | |
| 4400   PHILADELPHIA  ST | | |
| CHINO   CA   91710 | | |

---

☑ STORED   ☐ IMPOUNDED   ☐ RELEASED   ☐ RECOVERED - VEHICLE / COMPONENT

| TOWING / STORAGE CONCERN (NAME, ADDRESS, PHONE) | STORAGE AUTHORITY / REASON |
|---|---|
| DESERT VALLEY TOW, 17177  EUREKA  ST   VICTORVILLE, 760  658  5713 | CVC 22651 |

| REASON FOR STOP | AIRBAG? | DRIVEABLE? | | VIN SWITCHED? |
|---|---|---|---|---|
| OBSTRUCTED  PLATE | ☐YES ☑NO ☐1 ☐2 | ☑YES ☐NO ☐JUNK ☐UNK | | ☐YES ☑NO |

| CONDITION | YES | NO | ITEMS | YES | NO | ITEMS | YES | NO | TIRES / WHEELS | CONDITION |
|---|---|---|---|---|---|---|---|---|---|---|
| WRECKED | | ✓ | SEAT (FRONT) | ✓ | | CAMPER | | ✓ | LEFT FRONT | |
| BURNED HULK per 431(b) CVC | | ✓ | SEAT (REAR) | ✓ | | ALT. / GENERATOR | ✓ | | RIGHT FRONT | |
| VANDALIZED | | ✓ | RADIO | ✓ | | VESSEL AS LOAD | | ✓ | LEFT REAR | WORN |
| ENG. / TRANS. STRIP | | ✓ | TAPE DECK | ✓ | | FIREARMS | | ✓ | RIGHT REAR | |
| MISC. PARTS STRIP | | ✓ | TAPES | ✓ | | DIFFERENTIAL | ✓ | | SPARE | |
| BODY METAL STRIP | | ✓ | OTHER RADIO | ✓ | | TRANSMISSION | ✓ | | HUB CAPS | |
| SURGICAL STRIP per 431(b) CVC | | ✓ | IGNITION KEY | ✓ | | AUTOMATIC | ✓ | | SPECIAL WHEELS | |
| | | | | | | MANUAL | | | | |

| RELEASE VEHICLE TO: ☐R/O OR AGENT ☐AGENCY HOLD ☐22850.3 CVC | GARAGE PRINCIPAL / AGENT STORING VEHICLE (SIGNATURE) | DATE / TIME 305 |
|---|---|---|
| | Gregg  Tams | 11-13-19 |

CERTIFICATION - THE UNDERSIGNED, DO HEREBY CERTIFY THAT I AM LEGALLY AUTHORIZED AND ENTITLED TO TAKE POSSESSION OF THE ABOVE DESCRIBED VEHICLE.

| NAME OF PERSON / AGENCY AUTHORIZING RELEASE | I.D. NO. | DATE | |
| SIGNATURE OF PERSON AUTHORIZING RELEASE | | SIGNATURE OF PERSON TAKING POSSESSION | |

---

☐ STOLEN VEHICLE / COMPONENT   ☐ EMBEZZLED VEHICLE   ☐ PLATE(S) REPORT

| DATE / TIME OF OCCURRENCE | DATE / TIME REPORTED | NAME OF REPORTING PARTY (R/P) | DRIVER LICENSE NO. / STATE |
|---|---|---|---|
| LAST DRIVER OF VEHICLE | DATE / TIME | ADDRESS OF R/P | TELEPHONE OF R/P ( ) |

I CERTIFY AND DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF CALIFORNIA THAT THE FOREGOING IS TRUE AND CORRECT.

| | SIGNATURE OF PERSON MAKING REPORT |

**REMARKS**
[LIST PROPERTY, TOOLS, VEHICLE DAMAGE, ARRESTS]

| DRIVER'S NAME | ARRESTED / SECTION? | REPORTED BY | CARGO / TYPE? | VALUE $ |
|---|---|---|---|---|
| JONATHAN   ANDERSON | ☑YES ☐NO | | ☐YES ☐NO | ☐BILL OF LADING ATTACHED |

VEH   PULLED   OVER   FOR   OBSTRUCTED   PLATE.  DRIVER  FOUND   TO  HAVE
EXPIRED   COL   UPON   INVENTORY   SEARCH   FIREARM   LOCATED.  DRIVER  IS
CON VICTED   FELON.  VEH   PULLED   INTO  DRIVEWAY  TO  RES.  OWNER  OF  RES  DOESN'T  KNOW  DRIVER
VEH  HAS  MISC  SCRATCHES  &  DENTS  360°,  DAMAGE  TO  PASS.  DOOR  AND
TAILGATE.

| SIGNATURE OF OFFICER TAKING REPORT | I.D. NO. | SUPERVISOR | REQUIRED NOTICES SENT TO REGISTERED / LEGAL OWNERS PER 22852 CVC? ☐YES ☐NO | DATE NOTIFIED |
|---|---|---|---|---|
| D. PETERSON | 145163 | McColl | | 11/13/19 |

*An Internationally Accredited Agency*

3-ER-359

ANDERSON_00000050

Appendix B

Photographs of Anderson's Truck

3-ER-362, 3-ER-366, 3-ER-370, 3-ER-374, 3-ER-378









